# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Lars St. John,

        Plaintiff,

-vs-

Cuyahoga Metropolitan
Housing Authority, et al.,

        Defendants.

Case No. 1:21CV2198


JUDGE PAMELA A. BARKER


MEMORANDUM OPINION & ORDER

This matter is before the Court upon the Motion for Summary Judgment of Defendants Adrienne Page, Cornell Grimes, and Tyshaune Harris (collectively, "Defendants") filed on September 1, 2023.  (Doc. No. 64.)  *Pro se* Plaintiff Lars St. John ("Plaintiff" or "St. John") filed a Brief in Opposition (Doc. No. 66) on October 4, 2023, to which Defendants replied on October 18, 2023.  (Doc. No. 70.)  St. John thereafter filed a "Reply to Defendants' Reply Brief" (Doc. No. 75) on November 3, 2023.  On that same date, St. John also filed a Motion to Strike (Doc. No. 74), which Defendants have not opposed.

For the following reasons, St. John's Motion to Strike (Doc. No. 74) is DENIED.  Defendants' Motion for Summary Judgment (Doc. No. 64) is GRANTED IN PART and DENIED IN PART, as set forth herein.

## I.  Facts

### A.  St. John's Lease at Beachcrest

In May 2018, St. John signed a one-year lease (the "Lease") to become a tenant of Beachcrest, a high-rise apartment building operated by the Cuyahoga Metropolitan Housing Authority

("CMHA").  (Deposition of Lars St. John (Doc. No. 61-1) at Tr. 27–28, 42, 44-45; Doc. No. 61-2.)
Pursuant to the Lease, St. John was assigned Unit 314, which he testified is an efficiency unit on the
third floor of the Beachcrest property.  (St. John Depo. at Tr. 27- 28, 313.)

Article VIII of the Lease (entitled "Resident's Obligations") contains several provisions that
are relevant to the instant action.  Paragraph D of Article VIII provides, in relevant part, that Residents
are obligated to "abide by current CMHA administrative policies, regulations, and addenda thereto"
and that "[v]iolation of these policies, regulations, or addenda is a violation of this Lease."  (Doc. No.
61-2 at PageID# 962; St. John Depo. at Tr. 50-51.)  Paragraph E of Article VIII further provides, in
relevant part, that Residents are obligated to "comply with all obligations imposed upon [them] by
applicable provisions of state and local building or housing codes that materially affect the health
and/or safety of [the] Resident, household members, neighbors, and/or CMHA employees."  (*Id*.)

Another provision in Article VIII directs Residents to "make no alteration, repair or
redecoration to the unit or to the equipment therein, nor to install additional equipment . . . without
CMHA's prior written consent."  (Doc. No. 61-2 at PageID# 964.)  Article VIII also specifically
prohibits Residents from "chang[ing] the locks or install[ing] new or additional locks on exterior
doors." (Doc. No. 61-2 at PageID# 964.)  This section further provides that "[i]f CMHA cannot easily
gain access to the building because of unauthorized locks, Resident will be charged for the additional
costs that were incurred to gain such access." (*Id*.)

Article XI of the Lease (entitled "Entry of Premises During Tenancy") is also relevant to the
instant action.  (Doc. No. 61-2 at PageID# 968.)  Paragraph A of this Article provides, in relevant
part, as follows:

> Resident agrees that a duly authorized CMHA agent, employee, or representative shall
> be permitted to enter Resident's unit during reasonable hours (8:00 a.m. to 5:00 p.m.)

2

to perform routine maintenance and/or inspections, …., to make repairs or improvements, or for any other necessary reason.  Other than in emergency situations, CMHA will give forty-eight hour notice before it will enter the unit to affect [sic] the repairs. . . .

(*Id.*)  Paragraph B of Article XI further provides that "CMHA shall give Resident at least a forty-eight-hour written notice of CMHA's intent to enter the unit" and that "[s]uch notice may be placed under Resident's door."  (*Id.*)

Lastly, the Lease contains an "Acknowledgement" Section that provides as follows:

Resident hereby agrees that all the provisions of this lease have been read and understood.  Resident further agrees to be bound by its provisions and conditions as written.  By signing part II of the lease, resident agrees to be bound by the conditions contained in part I and further said signature acknowledges receipt of a copy of part I and II of the lease.[1]

(Doc. No. 61-2 at PageID# 975.)  In his deposition, St. John acknowledged that he signed the Lease and that he received a copy of it.[2]  (St. John Depo. at Tr. 42, 71, 78.)

On March 5, 2019, St. John's Lease was recertified for an additional one-year period.  (Doc. No. 61-2 at PageID# 981.)  Pursuant to the recertification documentation, other than the monthly rent amount, all the terms and conditions of St. John's Lease remained the same.  (*Id.*)

**B.    Bed Bug Procedure**

On the same date that he signed his May 2018 Lease, St. John also acknowledged receipt of CMHA's "Bed Bug Procedure."  (St. John Depo. at Tr. 80; Doc. No. 61-3.)  This Procedure provides,

---

[1] Part I of the Lease "establishes the terms and conditions of the Lease," including the specific terms and conditions set forth above.  (Doc. No. 61-2 at PageID#s 951, 952–75.)  Part II includes St. John's signature and certification of receipt and contains additional information specific to St. John, including identification of his unit address, occupancy date, rent amount, monthly utility allowance, and a listing of all pamphlets and materials provided to Plaintiff.  (St. John Dep. at Tr. 74; Doc. No. 61-2 at PageID#s 951, 976–81.)

[2] St. John testified, however, that he did not read the Lease before signing it because he was "kind of forced to sign it prior to reading."  (St. John Depo. at Tr. 70–71.)  St. John also testified that parts I and II of the Lease were not explained to him when he signed it.  (*Id.* at Tr. 78.)

3

in relevant part, that "[i]t is important that all residents report any suspected bed bugs immediately to their Property Manager."  (Doc. No. 61-3 at PageID# 982.)  The purpose of the Bed Bug Procedure is to "encourage all residents to immediately report any possible bed bug activity, and to comply with all obligations imposed upon Resident by applicable provisions of state and local building or housing codes that materially affect the health and/or safety" of Beachcrest's residents and CMHA employees. (*Id.*)

It is undisputed that bed bugs had been an issue at Beachcrest prior to May 2018 and continued to be an issue after St. John moved in, requiring regular bed bug inspections.  (St. John Depo. at Tr. 86 –88.)  St. John testified that he occasionally saw bed bugs in his Unit but that he never had an "infestation." (*Id*. at Tr. 81–82, 89.)

### C.    CMHA's Unsuccessful Attempts to Access St. John's Unit

St. John testified that, at some point after moving into his Unit, he added a "key chain lock" to the door that he used to enter and exit his Unit.  (St. John Depo. at Tr. 56.)  St. John acknowledged that he never asked CMHA management for permission to install this chain lock.[3]  (*Id.* at Tr. 54, 56.)

In March 2019, St. John received a letter from CMHA informing him that "[w]e have made several attempts to reach you so we could access your apartment to replace your smoke detector." (Doc. No. 61-5.)  The letter reads that "[i]f we are not able to access your unit, we will remove the chain permanently off your door."  (Doc. No. 61-5; St. John Depo. at Tr. 105–106.)  Two months

---

[3]  During his deposition, St. John offered many reasons why he felt justified in installing his chain lock without first seeking permission from CMHA.  St. John testified that the prohibition in the Lease against installing new or additional locks only applies to "exterior doors," which he interprets to mean only the door that leads outside of the building itself. (St. John Depo. at Tr. 55.)  He next testified that he believed he could install his chain lock because he claims that numerous Beachcrest tenants have installed "unauthorized" locks in their Units. (*Id*. at Tr. 383.)  Finally, St. John testified that he installed his chain lock because there are dangerous people living in his building, including convicted felons.  (*Id*. at Tr. 331.)  Defendants dispute the factual basis for each of the reasons proffered by St. John for installing his chain lock.

4

later, in May 2019, St. John received a "Notice of Termination and Invitation to Explain" from then-Beachcrest manager Alyse Dismond. (Doc. No. 61-6 at PageID# 985; St. John Depo. at Tr. 112–113.) The Notice provides, in relevant part, that "[t]he Management Office has received information that you have violated the Lease" because St. John denied the Site Manager access to his unit on May 20, 2019, for a "UPCS inspection" and on May 21, 2019, for a "Terminix inspection." (Doc. No. 61-6 at PageID#s 985–86; St. John Depo. at Tr. 113–114.) St. John was given an opportunity to meet with management to reply on May 29, 2019, but the meeting did not occur. (Doc. No. 61-6 at PageID# 985; St. John Depo. at Tr. 113.) It is undisputed that CMHA did not terminate St. John's lease because of this Notice.

At some point in 2019, Defendant Adrienne Page ("Defendant Page" or "Page") became the Beachcrest Site Manager. (Decl. of Adrienne Page (Doc. No. 64-1) at ¶ 2.) On November 14, 2019, Page sent an "Extermination Notice" to St. John, informing him that pest control would be coming to his Unit six days later (on November 20, 2019) for the prevention of bed bugs. (Doc. No. 61-7 at PageID# 987; St. John Depo. at Tr. 115-116.) The Notice further advised St. John to "make sure that an adult member is present at this time" and stated that "[i]f no one is present, Maintenance or Management/Exterminator will enter your home, in order to conduct this repair." (Doc. No. 61-7.) St. John first testified that he was not home on November 20, 2019, but then clarified that he was home but "no one came out on that date."[4] (St. John Depo. at Tr. 120, 122.)

On November 22, 2019, CMHA attempted to conduct a bed bug inspection of St. John's Unit. (Page Decl. at ¶ 3; Declaration of Cornell Grimes (Doc. No. 64-2) at ¶ 3; Doc. No. 61-10 at PageID#s

---

[4] CMHA also provided St. John with another "Extermination Terminix" notice for a roach extermination on November 19, 2019. (Doc. No. 61-8; St. John Depo. at Tr. 122–123, 125.) It is not clear whether CMHA did, in fact, attempt to conduct a roach extermination at St. John's Unit on that date.

990–91.)  The parties dispute what happened during this attempted inspection.  According to St. John, he was not home when CMHA attempted to inspect his Unit on November 22, 2019.  (St. John Depo. at Tr. 129, 133-134, 138.)  To the contrary, St. John testified that left his Unit at 8:00 a.m. that day to run errands, including a visit to the post office, and did not return until "at least" 7:00 or 8:00 p.m. that night.  (St. John Depo. at Tr. 134–135, 138.)

Defendant Cornell Grimes ("Officer Grimes") was employed as a CMHA police officer at the time.  According to a CMHA Police Incident Report, Officer Grimes provided a "general assist" at St. John's Unit at approximately 12:37 p.m. on November 22, 2019.  (Doc. No. 61-10 at PageID# 990.)  The Incident Report indicates that St. John was "refusing to open the door for maint[enance]" and that "mgmt. will try at a later time."  (*Id.* at PageID# 991.)  In a subsequent Declaration, Officer Grimes likewise avers that St. John "refused to open the door for maintenance to conduct a bed bug inspection" when they arrived at his Unit on November 22, 2019.  (Grimes Decl. at ¶ 3.)  Defendant Page also submitted a Declaration in which she avers that St. John was in his Unit on November 22, 2019, but "refused to open the door for maintenance."  (Page Decl. at ¶ 3.)  The parties agree that, on November 22, 2019, CMHA left a tag on St. John's door labelled "Maintenance" that specifically informed him that "Management will be in your Unit Wednesday November 27 for Bed Bug Inspection." (Doc. No. 61-10 at PageID# 994; St. John Depo. at Tr. 164-165.)

### D.     The November 27, 2019 Incident

Defendant Page requested that Officer Grimes and another CMHA Police Officer, Defendant Tyshaune Harris ("Officer Harris"), escort her and two maintenance employees to St. John's Unit for the bed bug inspection on November 27, 2019, "for her own safety as well as the safety of her staff." (Page Decl. at ¶ 4.)  *See also* Grimes Decl. at ¶ 4.  The parties agree that, at some point between 10:15

6

a.m. and 10:30 a.m. on that date, Defendant Page, Officer Grimes, Officer Harris, and CMHA maintenance employees Keith Allen ("Allen") and David Williams ("Williams"), went to St. John's Unit to conduct a bed bug inspection.  (Doc. No. 61-10 at PageID#s 997, 1000; St. John Depo. at Tr. 188-189.)  The parties present very different versions of what happened during this inspection.

St. John testified that he was in his Unit when the Defendants, Allen, and Williams arrived. He testified that someone knocked on his door and he asked, "who is it?" (St. John Depo. at Tr. 189.) St. John testified that Defendant Page replied, "we're here for the inspection." (*Id*.)  St. John was not dressed and asked them to wait.  (*Id*. at Tr. 191–92.)  Shortly thereafter, he heard loud banging on his door and a male voice saying, "police, open up" and, "open up, or we're coming in." (*Id*. at Tr. 190.) *See also* Citizen Complaint Form (Doc. No. 61-10 at PageID# 1000).  St. John finished getting dressed and opened the door.  (St. John Depo. at Tr. 192.)  He then inquired why they were at his Unit.  (*Id.* at Tr. 193.)  According to St. John, Defendant Page responded that they were there for a bed bug inspection.  (*Id*. at Tr. 189-190.)  *See also* Citizen Complaint Form (Doc. No. 61-10 at PageID#1000).

Defendant Page explained that CMHA maintenance had visited St. John's Unit on November 22, 2019 to conduct a bed bug inspection, but that he "sat on the couch" with his chain lock on the door.  (Doc. No. 61-10 at PageID#s 999–1000.)  St. John told her that he would not "stand here and listen to her lies." (*Id*.)  *See also* St. John Depo. at Tr. 195. He claims that, at that point, Officer Grimes "became more irate and belligerent and hostile" and screamed, "[t]his is going to be the worst day of your life if you don't move out of the way."  (St. John Depo. at Tr. 195, 204, 254, 265.)  *See also* Citizen Complaint Form (Doc. No. 61-10 at PageID# 1001).  St. John testified that Officer

Grimes proceeded to "put[] his hands on his gun and Taser." (St. John Depo. at Tr. 195-196, 204, 263.)

St. John testified that, although he "asked for them all not to enter," he (St. John) nevertheless allowed Defendants, Allen, and Williams into his Unit because Officer Grimes had "threatened to shoot me if I didn't move out the way" and "scream[ed] at the neighbors . . . to go back into their apartment." (St. John Depo. at Tr. 203-204, 229, 254.) According to St. John, after Defendants, Allen, and Williams entered his Unit, he (St. John) moved back into the living area of his Unit and Officer Grimes ordered him to "stand up and turn around and face the wall." (*Id.* at Tr. 202-203, 239.) St. John testified that at least one of the maintenance employees (Keith Allen) turned his furniture upside down. (*Id.* at Tr. 239.) St. John acknowledged that he did not see either Officer Grimes or Officer Harris search his Unit, unholster their weapons, or point their weapons directly at him. (*Id.* at Tr. 197, 237, 239, 242, 263-265.) He also acknowledged that neither Defendant Page, Officer Grimes, nor Officer Harris physically touched him. (*Id.* at Tr. 241, 247.)

Defendant Page and Officer Grimes were not deposed during discovery, but each submitted Declarations regarding their recollections of the November 27, 2019, incident.[5] In their respective Declarations, Defendant Page and Officer Grimes aver that Page requested that Officers Grimes and Harris provide a police escort for the bed bug inspection of St. John's Unit on November 27, 2019, because St. John had previously refused to open his door for a scheduled bed bug inspection and also for the safety of Page and her staff. (Page Decl. at ¶ 3–4; Grimes Decl. at ¶ 4.) Officer Grimes avers that he informed Page that he and Officer Harris could only provide an escort, and "could not use

---

[5] Officer Harris was not deposed and did not submit a Declaration in support of Defendants' Motion for Summary Judgment.

keys to access the apartment without a warrant." (Grimes Decl. at ¶ 4.)  According to Page, she was aware of St. John's unauthorized chain lock and that it constituted a violation of the Lease. (Page Decl. at ¶ 4.)

Defendant Page declares that when she, Officer Grimes, Officer Harris, Allen and Williams went to St. John's apartment, she knocked on his door "several times" and explained the reason for their visit. (*Id.* at ¶ 5.) Officer Grimes avers that, after Page knocked on St. John's door, he (Grimes) "felt that [she] did not lock loud [*sic*] enough for a senior with possible hearing loss to hear, so [he] knocked on the door louder." (Grimes Decl. at ¶ 5.) According to Officer Grimes, he "did not state that we were coming into Mr. St. John's unit." (*Id.* at ¶ 8.) Page and Grimes assert that St. John gave Defendants, Allen, and Williams permission to enter his apartment. (Page Decl. at ¶ 7; Grimes Decl. at ¶ 8.)

Officer Grimes further avers that, during the inspection he (Grimes) stood in a corner, "with my hands clasped together in a non-threatening posture," and that neither he nor Officer Harris searched St. John's Unit. (Grimes Decl. at ¶¶ 9, 10.) Officer Grimes and Defendant Page aver that St. John "was encroaching on Mrs. Page's and the maintenance employees' space" and "follow[ing] [Page] and the maintenance employees around as the bed bug inspection was being completed." (Page Decl. at ¶ 8; Grimes Decl. at ¶ 11.) Officer Grimes then "asked Mr. St. John to step back and let us do our job." (Grimes Decl. at ¶ 11.) Officer Grimes denies that he "became irate, abusive, discourteous, rude or loud towards" St. John and, further, denies stating that "this would be the worst day of [St. John's] life." (*Id.* at ¶ 12.)

Officer Grimes declares that neither he nor Officer Harris "unholstered or threatened Mr. St. John with any weapon" or "verbally threatened or physically made any threatening gestures toward

9

Mr. St. John."  (*Id.* at ¶ 13.)  Defendant Page likewise avers that she "did not hear Officer Grimes or Officer Harris make any threats towards" St. John and that she did not see either Officer Grimes or Officer Harris "touch their Tasers or handguns."  (Page Decl. at ¶ 10.)  Page further declares that she explained to St. John that the chain lock was an unauthorized violation of the Lease before asking one of the maintenance employees to cut it off.  (*Id.* at ¶ 9.)

On December 3, 2019, St. John filed a Citizen Complaint with the CMHA Police Department ("CMHA PD") regarding the November 27, 2019 incident.  (Doc. No. 61-10 at PageID#s 1000–04.) The CMHA PD thereafter commenced an official investigation.  (*Id.* at PageID# 1005.)  On February 21, 2020, the CMHA PD found St. John's allegations "unsubstantiated" and that the "Officers acted in accordance with established CMHA PD Policies & Procedures and Rules and Regulations."  (*Id.* at PageID# 1017.)

## II.    Procedural History

On November 18, 2021, St. John filed a *pro se* Complaint in this Court asserting various federal claims arising out of the November 27, 2019 incident.  (Doc. No. 1.)  St. John named the following as defendants:  (1) CMHA; (2) CMHA employees Jeffery K. Patterson, Darlene Sledge, Diana Hockett Stubbs, Roberta Cleveland, Alyse Dismond/or Desmond, Adrienne Page, Le Ana Peebles, and Angela Rice;  (3) the CMHA Police Department ("CMHA PD"); (4) CMHA PD Chief Andres Gonzalez; (5) CMHA Police Officers Cornell Grimes and Tyshaune Harris; (6) the U.S. Department of Housing and Urban Development ("HUD") and (7)  HUD Field Director Pamela E. Ashby.  (Doc. No 1.)  On April 20, 2022, St. John moved to amend his Complaint because he inadvertently misidentified a non-party referenced in paragraph 3.  (Doc. No. 11.)  The Court granted

10

St. John's Motion to Amend, ordering that his initial Complaint would now be construed as set forth in his April 20, 2022 Motion. *See* Non-Doc Order dated April 28, 2022.

In his Amended Complaint, St. John asserts the following claims: (1) discrimination in violation of Title VI of the Civil Rights Act of 1964, the Fair Housing Act, and Ohio Rev. Code § 411.02(H) (Count I); (2) harassment in violation of the Fair Housing Act (Count II); and (3) claims under 42 U.S.C. § 1983 for unlawful entry (Count III), warrantless entry (Count IV), unlawful search and seizure (Count V) and excessive force (Count VI). (Doc. No. 1.) Additionally, although not separately captioned as "counts," St. John alleges that the CMHA Defendants[6] and the HUD Defendants violated his rights under 18 U.S.C. § 242, 18 U.S.C. § 249, 42 U.S.C. § 3613, 42 U.S.C. § 3631, and 42 U.S.C. § 3604. (*Id*. at p.1, caption; ¶ 62.)

On May 9, 2022, the CMHA Defendants moved to dismiss St. John's Complaint under Fed. Rules of Civ. P. 12(b)(5) and 12(b)(6). (Doc. No. 14.) St. John opposed the Motion. (Doc. No. 15.) On August 30, 2022, the Court issued a Memorandum Opinion & Order granting the Motion under Rule 12(b)(6) as to all CMHA Defendants with respect to Counts I and II, and as to all CHMA Defendants other than Defendants Page, Grimes, and Harris with respect to Counts III through VI. (Doc. No. 18.) The Court denied the Motion as to Defendants Page, Grimes, and Harris only, as to Counts III through VI. (*Id*.) The Court also *sua sponte* dismissed the HUD Defendants under Rule 12(b)(6). (*Id*.) Thus, after the issuance of this Court's August 30, 2022 Memorandum Opinion & Order, the only remaining claims in this action are (1) St. John's § 1983 claims against Defendants Page, Grimes, and Harris for Unlawful Entry (Count III), Warrantless Entry (Count IV), Unlawful

---

[6] The Court uses the term "CMHA Defendants" to refer to CMHA; CMHA employees Jeffery K. Patterson, Darlene Sledge, Diana Hockett Stubbs, Roberta Cleveland, Alyse Dismond/or Desmond, Adrienne Page, Le Ana Peebles, and Angela Rice; the CMHA PD; CMHA PD Chief Andres Gonzalez; and CMHA Police Officers Grimes and Harris.

11

Search and Seizure (Count V), and Excessive Force (Count VI); and (2) his claims against these Defendants under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631.

On January 23, 2023, the Court conducted a Case Management Conference ("CMC") with St. John and Defendants Page, Grimes, and Harris, at which time it set a fact discovery deadline of August 1, 2023 and a dispositive motion deadline of September 1, 2023.[7]  (Doc. No. 32 at p. 2.)

On June 26, 2023, St. John filed a Motion to Compel ("First Motion to Compel").  (Doc. No. 47.)  Therein, St. John asked the Court to order Defendants to provide full and complete answers to Interrogatories relating to the identities of certain CMHA employees and the Defendants' cell phone carriers.  (*Id*.)  St. John also asked the Court to order Defendants to produce documents responsive to several of his Requests for Production ("RFPs"), including RFPs seeking (1) all documents "pertaining to a work order for [] Plaintiff's apartment" (RFP No. 1); (2) "the work schedule for CMHA P.D. officer [*sic*] for the month of November 2019" (RFP No. 5); (3) his "resident file" (RFP No. 6); (4) "all documents pertaining to Citizen Complaint filed by Plaintiff" and "[t]he investigation report" (RFP No. 11); and (5) "CMHA's investigation file regarding the events of November 27, 2019" (RFP No. 19).  (*Id*.)

 The Court conducted a status conference on June 28, 2023.  The Court entered a Minute Order that date, in which it stated (in pertinent part) as follows:

> The Court confirmed that Plaintiff's deposition is set to take place on July 10, 2023 and that the current discovery dispute between the parties does not affect the taking of Plaintiff's deposition as scheduled. The Court and Mr. St. John and defense counsel also discussed the third-party subpoenas that have been issued by Plaintiff, who

---

[7] On April 10, 2023, St. John filed a Motion for Leave to Amend his Complaint, in which he sought to add CMHA maintenance workers Keith Allen and David Williams as Defendants.  (Doc. No. 35.)  Defendants opposed the Motion. (Doc. No. 37.)  On June 8, 2023, this Court issued a Memorandum Opinion & Order denying St. John's Motion to Amend. (Doc. No. 44.)

> confirmed that he has received some documents in response but is awaiting further documents/responses. *** Plaintiff made an oral motion to extend the case management deadlines, but the Court declined to entertain or decide Plaintiff's oral motion until after resolution of a discovery dispute raised by Plaintiff in a motion to compel filed on June 26, 2023.

(Non-Document Minutes, June 28, 2023.) The Court then construed St. John's First Motion to Compel as a Position Paper[8] and ordered the parties to meet and confer by July 7, 2023. (*Id.*) The Court further ordered Defendants to file a response by July 13, 2023, if the parties failed to resolve their dispute. (*Id.*)

Defendants filed a Response on July 13, 2023. (Doc. No. 49.) In relevant part, Defendants advised the Court that they had supplemented their responses to numerous RFPs (including RFPs 1, 6, 11, and 19) on July 7, 2023, leaving for resolution only the parties' disputes regarding St. John's Interrogatories and three of St. John's RFPs, including RFP No. 5. (*Id.* at p. 3.) With regard to RFP No. 5, Defendants maintained that the documents responsive to this request were not in their possession because CMHA was the "record keeper[]" of the requested documents." (*Id.* at p. 7.) Regardless, Defendants claimed that they "did produce to Plaintiff all documents identified in Defendants' Initial Disclosures." (*Id.*)

On July 14, 2023, the Court issued a Minute Order finding, in pertinent part, as follows:

> Upon review of the parties' position papers, their respective exhibits, and Defendants' supplemental production, the Court is persuaded that Defendants' responses to interrogatories 18, 20, 21, and 22, and requests for production 5, 12, and 21 are sufficient. At the heart of Plaintiff's dispute with Defendants is the question of whether Defendants have personal knowledge of the information Plaintiff seeks and whether Defendants have the documents that Plaintiff seeks in their personal possession. The

---

[8] The Court reminded Plaintiff that the Court's protocol for bringing forth discovery disputes (which was mailed to him on January 23, 2023, along with a copy of the CMC Order) "requires the parties to meet and confer and verify that the parties have done so." (*Id.*) *See also* Doc. No. 32-1 at p. 1. The Court observed that Plaintiff had failed to comply with this protocol concerning his First Motion to Compel. (Non-Document Minutes, June 28, 2023; Doc. No. 47.)

only remaining defendants are individuals who are either currently or formerly employed by either CMHA or CMHA's police department. (Doc. No. 18, PageID# 223.) CMHA and CMHA PD are no longer defendants in this action. (*Id*.) Thus, the remaining defendants (Page, Harris, and Grimes) may respond and/or produce documents only to the extent that their personal knowledge allows them to do so. Defendants indicate that they do not have further personal knowledge regarding the individuals listed in interrogatories 18, 20, and 22. Defendant Page also indicates that she is unaware of the mobile phone carrier for her CMHA cell phone, as requested in interrogatory 21. These responses are sufficient. Additionally, the remaining requests for production seek documents that are related to CMHA PD's records and policies. Defendants indicated multiple times that they have no such documents. These responses are sufficient. Accordingly, the discovery dispute is resolved.

(Non-Document Minute Order dated July 14, 2023).

St. John thereafter filed a second Motion to Compel on July 28, 2023. (Doc. No. 52.) St. John claimed that Defendants' counsel sent the supplementary documents to St. John via email, even though he had previously declined to accept service via email. (*Id*. at p. 1.) He argued that he had "not received [the] documents [that] Defendants state[d] were supplemented" and requested that the Court order Defendants to mail him the supplemental documents via regular mail. (*Id*. at p. 2.) Defendants filed a Response, in which they argued that St. John's Motion was without merit because Defendants had mailed "a hardcopy of the document production" to St. John on July 10, 2023, which had not been returned to sender. (Doc. No. 53 at p. 3.)

On August 1, 2023, the Court issued an Order concluding that the supplementary documents sent by Defendants "never arrived" and that it "appear[ed] the documents are lost." (Non-Document Order, Aug. 1, 2023.) The Court ordered Defendants to "resend the supplemental production" to St. John's P.O. Box by close of business on August 1, 2023, and to "obtain a tracking number to confirm that the supplemental production is properly delivered." (*Id.*)

On July 31, 2023, the day before the close of discovery, St. John filed a Motion for Extension of Discovery, in which he requested an extension of the discovery deadline "to obtain all information,

14

documents, materials, etc. needed for trial." (Doc. No. 54 at pp. 1–2.) St. John noted that "there have been many delays" in discovery, including (but not limited to) delays associated with the filing of his Motions to Compel and the failure of unidentified third parties to respond to his subpoenas. (*Id*.) St. John requested an extension until August 31, 2023, the day before the dispositive motion deadline. (*Id.*) Defendants opposed St. John's Motion. (Doc. No. 57.)

On August 4, 2023, the Court denied St. John's Motion for Extension, finding that he "has not articulated a sufficient basis for needing an extension of the discovery deadline." (Non-Document Order, Aug. 4, 2023.) The Court further explained that it would "not entertain any additional motions related to discovery" and prohibited both parties "from issuing or seeking any additional discovery in this matter."[9] (*Id.*)

On September 1, 2023, Defendants Page, Harris, and Grimes filed a Motion for Summary Judgment as to each of St. John's remaining claims. (Doc. No. 64.) On October 4, 2023, St. John filed a Brief in Opposition.[10] (Doc. No. 66.) Two days later, on October 6, 2023, St. John filed a Declaration. (Doc. No. 68.) On October 18, 2023, Defendants filed a Reply in support of their Motion for Summary Judgment. (Doc. No. 70.) On November 3, 2023, St. John filed, without seeking leave of Court, a Reply to Defendants' Reply Brief in Support. (Doc. No. 75.) On that same date, St. John also filed a Motion to Strike certain portions of Defendants' Reply. (Doc. No. 74.) Defendants did not file a Response to Plaintiff's Motion to Strike.

### III.    Standard of Review

---

[9] On August 30, 2023, St. John again moved to amend his Compliant, this time to assert a claim for false imprisonment. (Doc. No. 59.) The Court denied the Motion on August 31, 2023. (Doc. No. 60.)

[10] On November 3, 2023, Plaintiff filed a Motion to Leave of Court for Additional Pages for Plaintiff's Response, which the Court granted on November 6, 2023. (Doc. No. 71; Non-Document Order, Nov. 6, 2023.)

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004)). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487 (citing *Hedrick*, 355 F.3d at 451).

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[T]he moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 256). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex*, 477 U.S. at 325).

16

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508–09 (citing *Anderson*, 477 U.S. at 256).  "[T]he nonmoving party may not simply rely on its pleading but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.  Analysis

Defendants Page, Harris, and Grimes move for summary judgment in their favor with respect to St. John's § 1983 claims for unlawful/warrantless entry, unreasonable search and seizure, and excessive force, as well as on his claims under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631.  (Doc. No. 64.)  Regarding St. John's § 1983 claims, Defendants first argue that St. John cannot establish a claim against Defendant Page as a matter of law because "it is undisputed that Page is neither a police officer nor was she acting under color of state [law] on November 27, 2019."  (*Id* at pp. 7-8.)  Defendants next argue that they are entitled to qualified immunity because St. John cannot establish that any of the Defendants violated his constitutional rights, or that the alleged unlawfulness of their conduct was clearly established at the time of the November 27, 2019 incident.  (*Id*. at p. 8-12.)  Lastly, Defendants argue that St. John's claims under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631 fail because none of those statutes create private causes of action.  (*Id*. at pp. 12-13.)

In his Brief in Opposition, St. John first contends that summary judgment should be denied because it is premature under Federal Rule 56(d),[11] as he "has not had the opportunity" to complete

---

[11] St. John cites Fed. R. Civ. P. 56(f) in support of his request for additional discovery.  Prior to 2010, Rule 56(f) did relate to requests for additional discovery to oppose summary judgment.  However, the former Rule 56(f) was renumbered as Rule 56(d) in 2010 as a result of amendments to Fed. R. Civ. P. 56.  *See* Fed. R. Civ. P. 56, Advisory Committee Notes,

17

discovery. (Doc. No. 66 at p. 3.) St. John then sets forth his version of the facts leading up to and occurring on November 27, 2019, highlighting several specific factual contentions by the Defendants with which he disagrees.[12] (*Id*. at pp. 21.) St. John does not directly address any of Defendants' specific legal arguments, other than to assert, generally, that "[t]he law was clearly established at the time of entry that a warrantless entry into a private dwelling, absent of exigent circumstances, is unlawful." (*Id*. at p. 23.) St. John filed a Declaration two days later, in which he sets forth additional factual allegations regarding the November 27, 2019 incident. (Doc. No. 68.)

In Reply, Defendants argue that St. John "fails entirely to address a single legal argument set forth in Defendants' Motion for Summary Judgment," which they contend is "fatal to his claims." (Doc. No. 70 at pp. 1-2.) Defendants dispute St. John's assertion that he is entitled to further discovery under Rule 56(d) on numerous grounds, including that St. John failed to provide the affidavit or declaration required by that Rule. (*Id*. at p. 4-5.) Defendants then list the legal arguments in their Motion to which St. John failed to respond, arguing that the Court should treat all such arguments as abandoned. (*Id*. at pp. 5-6.) Lastly, Defendants argue that St. John's Brief in Opposition

---

2010 Amend. As the current Rule 56(f) relates to "Judgment Independent of the Motion" and has no bearing on St. John's request for further discovery, the Court construes St. John's request as asserted under the current Rule 56(d).

[12] The "Statement of Facts and Factual Background" section of St. John's Brief in Opposition also contains several pages of allegations regarding (1) alleged disciplinary actions taken against Defendants Page, Harris, and Grimes; (2) Officer Grimes' alleged medical history; (3) alleged disciplinary actions against, and the criminal histories of, Mr. Allen, Mr. Williams, Alyse Dismond, Darlene Sledge, and Roberta Cleveland; and (4) the alleged criminal histories of several of St. John's Beachcrest neighbors. (Doc. No. 66 at pp. 6-11.) St. John attaches numerous Exhibits to his Brief in Opposition relating to the above. (Doc. Nos. 66-1 through 66-22.) Defendants assert that statements in St. John's Brief in Opposition regarding the alleged disciplinary actions, criminal histories, and medical history of the Defendants and various non-parties to this action (and the Exhibits relating thereto) are irrelevant and harassing. (Doc. No. 70 at p. 1.) The Court agrees with Defendants that the above information and Exhibits are not relevant to St. John's remaining claims and, thus, the Court will not consider them herein.

fails to comply with Local Rule 7.1 in numerous respects and, further, that his untimely Declaration (Doc. No. 68) should be disregarded. (*Id*. at p. 1, fn. 1.)

### A. St. John's Request for Additional Discovery under Fed. R. Civ. P. 56(d)

Prior to reaching the merits of Defendants' arguments that they are entitled to summary judgment in their favor on St. John's remaining claims, the Court will address whether St. John has established that he is entitled to additional discovery under Fed. R. Civ. P. 56(d). For the following reasons, the Court finds that he has not.

Federal Rule of Civil Procedure 56(d) provides as follows:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "The purpose behind Rule 56(d) is to ensure that plaintiffs receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (quoting *Ball v. Union Carbide Corp*., 385 F.3d 713, 719 (6th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986)). "'A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating ... how postponement of a ruling on the motion will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact.'" *FTC v. E.M.A Nationwide, Inc*., 767 F.3d 611, 623 (6th Cir. 2014) (quoting *Willmar Poultry Co. v. Morton-Norwich Prods., Inc*., 520 F.2d 289, 297 (8th Cir. 1975)).

19

The Sixth Circuit has found that, in order to receive relief under Rule 56(d), "the non-movant must file an affidavit pursuant to Fed. R. Civ. 56(d) that details the discovery needed, or file a motion for additional discovery." *Zakora v. Chrisman*, 44 F.4th 452, 479 (6th Cir. 2022).  If the nonmovant elects to file a motion, it too "must be supported by a proper 'affidavit or declaration.'" *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 226 (6th Cir. 2015) (quoting Rule 56(d)).  The Sixth Circuit has noted that the filing of an affidavit "that complies with Rule 56(d) is essential, and [] in the absence of such a motion or affidavit, [courts] 'will not normally address whether there was adequate time for discovery.'"  *Unan v. Lyon*, 853 F.3d 279, 292 (6th Cir. 2017) (quoting *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995)).

However, the Sixth Circuit has also cautioned against "unduly exalt[ing] form over substance" when evaluating Rule 56(d) requests. *See United States v. Rohner*, 634 Fed. Appx. 495, 504 (6th Cir. 2015) (quoting *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 618 (6th Cir. 2002)).  Thus, the Sixth Circuit has found that "a formal affidavit may not be required 'when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneous with the motion for summary judgment.'" *Unan,* 853 F.3d at 292 (quoting *Rohner,* 634 Fed. Appx. at 504).  *See also Arla v. Liberty Mutual Group, Inc.*, 715 Fed. Appx. 517, 518 (6th Cir. 2018); *Moore v. Shelby County, Kentucky*, 718 Fed. Appx. 315, 319 (6th Cir. 2017); *Kitchen v. Snyder,* 2021 WL 4470032 at * 3 (6th Cir. June 23, 2021).

Substantively, Rule 56(d) has been interpreted as requiring a requesting party to "indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). *See also Doe*, 928 F.3d at 490. "The party opposing a motion for summary judgment ...

possesses no absolute right to additional time for discovery under Rule 56." *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989).  For this reason, a Rule 56(d) request may be properly denied where the requesting party "makes only general and conclusory statements [ ] regarding the need for more discovery," *Ball*, 385 F.3d at 713 (quoting *Ironside v. Simi Valley Hosp*., 188 F.3d 350, 354 (6th Cir.1999)), or where the affidavit (or declaration) "lacks 'any details' or 'specificity.'" *Id*. (quoting *Emmons*, 874 F.2d at 357).  In addition, "'[a] district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided.'"  *In re Bayer Healthcare*, 752 F.3d 1065, 1074 (6th Cir. 2014) (quoting *United States v. Dairy Farmers of Am., Inc*., 426 F.3d 850, 862 (6th Cir. 2005)).  *See also Doe*, 928 F.3d at 490.  The decision regarding whether to grant a Rule 56(d) motion falls within the district court's sound discretion.  *See Ball,* 385 F.3d at 720.

Here, Defendants argue that the Court should deny St. John's Rule 56(d) request because he "has not shown by affidavit or declaration" why he cannot present facts essential to oppose Defendants' Motion for Summary Judgment.[13]  (Doc. No. 70 at p. 4.)  Defendants are correct that St. John did not attach an affidavit or declaration to his Brief in Opposition, which was filed on October 4, 2023.  (Doc. No. 66.)  The Court notes, however, that St. John did file a Declaration two days later, on October 6, 2023.  (Doc. No. 68.)  Moreover, and notably, in his Brief in Opposition, St. John expressly argues that he had an inadequate opportunity for discovery under Rule 56(d).  (Doc. No. 66.)

---

[13] The Court notes that Defendants fail to recite the standard of Rule 56(d) or otherwise cite any law regarding this Rule at any point in their Reply Brief.  (Doc. No. 70.)

As noted above, the Sixth Circuit has found that a formal affidavit or declaration seeking additional discovery under Rule 56(d) may not be required under certain circumstances.  *See, e.g.,* U*nan,* 853 F.3d at 292; *Rohner,* 634 Fed. Appx. at 504; *Arla v,* 715 Fed. Appx. at 518.   In *Moore, supra*, the Sixth Circuit explained as follows*:*

> We have observed that filing an affidavit that complies with Rule 56(d) is essential, and that in the absence of such a motion or affidavit, 'this court will not normally address whether there was adequate time for discovery' *Plott,* 71 F.3d at 1196. But we have also observed that although Rule 56 'provides courts with a useful method by which meritless cases may be discharged.... the benefits of this rule are quickly undermined if it is employed in a manner that offends concepts of fundamental fairness.' *White's Landing*, 29 F.3d at 231. Indeed, 'a formal affidavit may not be required 'when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment.'' *Unan v. Lyon*, 853 F.3d 279, 293 (6th Cir. 2017) (quoting *United States v. Rohner,* 634 Fed. Appx. 495, 504 (6th Cir. 2015)).
>
> Plaintiff argued in her opposition to Defendants' motion for summary judgment that she had an inadequate opportunity for discovery. Requiring a redundant 56(d) affidavit in this case, where Plaintiff has already made the argument in her opposition brief, would unduly exalt form over substance. Indeed, as we said in *Abercrombie*, "[m]aking the arguments once is enough." 280 F.3d at 628. Thus, although Plaintiff filed neither a Fed. R. Civ. P. 56(d) affidavit nor a request for additional discovery, by making the argument in her opposition brief, she complied with the substance and purpose of Rule 56(d) and fulfilled her "obligation to inform the district court of [her] need for discovery" prior to a decision on the summary judgment motion. *Id.* at 627.

*Moore*, 718 Fed. Appx. at 319.

Considering the above, the Court rejects Defendants' argument that St. John's Rule 56(d) request should be denied solely on the grounds that he did not file an affidavit or declaration contemporaneously with his Brief in Opposition. Rather, and consistent with the Sixth Circuit authority cited above, the Court will consider the arguments raised by St. John in his Brief in Opposition in support of his Rule 56(d) request.  Additionally, out of an abundance of caution and in

22

light of St. John's *pro se* status, the Court will also consider St. John's October 6, 2023 Declaration

(Doc. No. 68) in evaluating his request for additional discovery.

In his Brief in Opposition, St. John argues that "summary judgment should be denied as

premature under Fed. R. Civ. P.  56[d] because Plaintiff require[s] additional time for investigating

and research into Defendants' 'surprise' documents." (Doc. No. 66 at p. 5.)  The entirety of St. John's

argument is as follows:

> Defendants[] resisted giving Plaintiff documents that were disclosed in their Initial
> Discovery; due by February 6, 2023. Plaintiff had to subpoena them, where
> Defendants still refused to deliver[] "CMHA Police Investigation Report" to Plaintiff.
> Which led to Plaintiff having to file a Motion to Compel Discovery. Also, during
> Plaintiff's deposition on July 10, 2023; Defendant's surprised Plaintiff with a never
> seen before nor heard of exhibit showing a CMHA P.O. Incident Report for the date
> of November 22, 2019. At the end of the deposition, Plaintiff asked if he could have a
> copy? Defense attorney Bernard said no. (See Attachment- email) The Defendants'
> sending Plaintiff CMHA Police Report six months after it was due and sending
> Plaintiff CMHA P.D. Incident Report for November 22, 2019, with the filing of their
> Motion for Summary Judgment; seven months after it was due. Summary judgment
> should not be granted where it may be the result of unfair surprise. *See Bennett v. City
> of Eastpointe*, 410 F. 3d 810, 817 (6th Cir. 2005); *Clorox v. Proctor & Gamble*, 228
> F. 3d 24, 31 (1st Cir. 2000); *Macklin v. Butler*, 553 F. 2d 525, 529 (7th Cir. 1977).
>
> In considering a motion for summary judgment, courts have the duty to "ensure ... that
> neither side in a dispute[has] unfairly surprise[d] the other with evidence that the other
> has not had time to consider." *Orsi v. Kirkwood,* 999 F. 2d 86, 91 (4th Cir. 1993).
> Granting summary judgment on the basis of evidence created and disclosed by the
> Defendants' simultaneously with their Motion for Summary Judgment would
> constitute unfair surprise.

(*Id*. at pp. 5-6) (grammar and punctuation as in original).  In his October 6, 2023 Declaration, St. John

does not directly address Rule 56(d) or articulate a need for additional discovery and, instead, asserts

additional factual allegations regarding the November 27, 2019 incident.  (Doc. No. 68.)

For the following reasons, the Court finds that St. John has failed to satisfy the requirements

of Rule 56(d).  Nowhere in either his Brief in Opposition or his October 6, 2023 Declaration does St.

23

John articulate the need for any specific forms or topics of discovery, identify any material facts that he hopes to discover, or otherwise include any detail or specificity regarding what additional discovery he feels he needs to oppose Defendants' summary judgment motion.  Nor does St. John explain (in either his Brief in Opposition or his Declaration) why he was not able, over the course of the nearly seven-month discovery period in this case, to conduct discovery that he now believes is necessary.  Notably, although St. John complains that Defendants failed to produce the CMHA Reports regarding the November 22 and 27, 2019 incidents until July 2023, he fails to explain *what* additional discovery he believes he needs based on those documents or *why* he needs such additional discovery to oppose Defendants' summary judgment motion.  For example, St. John does not identify any specific documents or witnesses that he became aware of only after receiving Defendants' supplemental production, nor does he articulate why additional discovery of any such documents and/or witnesses might be relevant to his claims.  He also fails to identify, even broadly, the topic of the discovery he purportedly needs because of Defendants' allegedly late production of the CMHA Reports in question.  St. John's Brief in Opposition and October 6, 2023 Declaration, therefore, fail to satisfy the requirements of Rule 56(d).

The Court notes that St. John also asserts, in passing, that he "expressed to the court via [his] Motion for Extension" the need for further time to complete discovery.  (Doc. No. 66 at p. 3.)  As discussed *supra*, St. John filed a Motion for Extension of Discovery (Doc. No. 54) on July 31, 2023, approximately one month before Defendants filed their summary judgment motion.  The Court denied St. John's Motion for Extension, finding that "Plaintiff has not articulated a sufficient basis for needing an extension of the discovery deadline." (Non-Doc.Order, Aug. 4, 2023).  Nonetheless, some Sixth Circuit cases suggest that such a motion for extension, filed shortly before a summary judgment

motion, may be considered in connection with a request for additional discovery under Rule 56(d). *See, e.g., Unan,* 853 F.3d at 292 (finding that "a formal affidavit may not be required 'when a party has clearly explained its need for more discovery on a particular topic to the district court *prior to* or contemporaneous with the motion for summary judgment.'") (emphasis added) (quoting *Rohner,* 634 Fed. Appx. at 504).

Even assuming *arguendo* that St. John's Motion for Extension is properly considered in the context of his Rule 56(d) request, the Court finds that it too fails to satisfy the requirements of Rule 56(d).  In his Motion, St. John requested an extension due to (1) delays associated with Defendants' responses to his written discovery; and (2) the failure of unidentified "third parties"[14] to respond to his subpoenas.  (Doc. No. 54 at p. 2.)  Again, however, St. John fails to explain what material facts he hopes to uncover through additional discovery, or how such material facts would enable him to adequately oppose summary judgment.  Indeed, St. John does not even identify which "third parties" have allegedly failed to respond to his subpoenas; what information he requested in those subpoenas; or why he believes such information would be relevant to his claims and/or enable him to survive summary judgment.  *See Cacevic*, 226 F.3d at 488.  Thus, St. John's Motion for Extension is likewise insufficient to satisfy the requirements of Rule 56(d).

As the Sixth Circuit has explained, "[i]t is not an abuse of discretion for the district court to deny [a] discovery request [under Rule 56(d)] when the party 'makes only general and conclusory statements in its affidavit regarding the need for more discovery.'" *Ball*, 385 F.3d at 720 (quoting

---

[14] Based on the correspondence attached as Exhibits to St. John's Motion for Extension, it appears that St. John issued subpoenas to CMHA and CMHA PD in April or May 2023, but served them on counsel for Defendants Page, Grimes, and Harris.  (Doc. No. 54-1.)

*Ironside*, 188 F.3d at 354.) "'Fairness does not blindly require a district court to grant a non-movant an opportunity for discovery where, as here, the non-movant does not in any detail describe what discovery []he needs or what material facts []he hopes to discover.'" *Zakora*, 44 F 4th at 479-480 (quoting *Short v. Oaks Correctional Facility*, 129 Fed. Appx 278, 283 (6th Cir. 2005)). Additionally, "[i]t is not enough to state that discovery is needed without explaining *why* it is needed." *Id*. (emphasis in original). Here, for all the reasons set forth above, the Court finds that St. John has failed to sufficiently explain (in either his Brief in Opposition, Declaration, or Motion for Extension) what additional discovery he needs or why he needs it. Accordingly, St. John's Rule 56(d) request is without merit and denied. [15]

---

[15] Because St. John failed to identify the discovery he now seeks, the Court finds that it need not address the merits of his Rule 56(d) request. *See, e.g., Ball*, 385 F.3d at 719-721 (denying Rule 56(d) request solely on the basis of failure to sufficiently identify desired discovery); *Cacevic*, 226 F.3d at 488-489 (same); *Scadden v. Werner*, 677 Fed. Appx. 996, 999 (6th Cir. 2017) (same). Even if the Court were to nonetheless attempt to do so, St. John's request would still fail. The Sixth Circuit has directed district courts to consider the following five factors in evaluating the merits of a Rule 56(d) request: "(1) when the plaintiff learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would change the ruling of the trial court; (3) how long the discovery period lasted; (4) whether the plaintiff was dilatory in his discovery efforts; and (5) whether the defendants were responsive to discovery requests." *Doe*, 928 F.3d at 491 (quoting *Plott v. General Motors Corp*., 71 F.3d 1190, 1196-1197 (6th Cir. 1995)). These are known as the "*Plott* factors." *Id*. "The main inquiry among these factors is whether the moving party was diligent in pursuing discovery." *Dowling v. Cleveland Clinic Found*., 593 F.3d 472, 478 (6th Cir. 2010). Here, as to the first and second factors, the Court cannot determine when St. John "learned of the issue that is the subject of the desired discovery" or "whether the desired discovery would change the [court's] ruling" because St. John does not identify the nature, topic, or scope of the discovery he desires. Thus, the first and second factors do not weigh in St. John's favor. As to the third factor, the discovery period in this case was approximately six and a half months. The Sixth Circuit has found discovery periods of five and seven months to be sufficient in this context. *See, e.g., E.M.A. Nationwide, Inc*., 767 F.3d at 625 (finding that nearly five months was enough time); *Jordan v. City of Detroit*, 557 Fed. Appx 450, 456 (6th Cir. 2014) ("[T]he discovery period [in a § 1983 action] lasted about seven months, a reasonable time frame."). Thus, this factor weighs against St. John's request. As to the fourth factor, St. John has not demonstrated that he was diligent in pursuing discovery. It appears that St. John did not serve some of his third-party subpoenas until May and June 2023 (Doc. Nos. 43, 46, 48), and then apparently waited until July 2023 to serve additional subpoenas. (Doc. No. 57 at p. 3.) Moreover, despite having seven months to do so, St. John did not depose either Defendants Page, Grimes, or Harris. Thus, the Court finds that this factor weighs against St. John's request. Finally, the Court finds that the fifth factor likewise weighs against St. John. Defendants provided documents and interrogatory responses to St. John and supplemented their discovery in response to this Court's Order. The Court previously concluded that Defendants satisfied their discovery obligations and finds no reason to question that conclusion now. Accordingly, given that none of the *Plott* factors weighs in St. John's favor, the Court finds that St. John's Rule 56(d) would fail on the merits.

Lastly, the Court rejects St. John's assertion that addressing Defendants' Motion for Summary Judgment at this time would subject him to "unfair surprise."  First, as discussed *supra,* the CMHA Reports relating to the November 22 and 27, 2019 incidents were, in fact, produced to St. John in July 2023 — prior to the close of fact discovery on August 1, 2023.  Second, St. John has not demonstrated that Defendants failed to disclose any documents that were allegedly "created and disclosed … simultaneously with their Motion for Summary Judgment." (Doc. No. 66 at p. 6.)  The only documents attached to Defendants' Motion are the Declarations of Defendants Page and Grimes. St. John had ample opportunity to depose Page and Grimes during the seven-month discovery period in this case but chose not to do so.  Defendants were not required to "disclose" Page's and Grimes' Declarations prior to filing their summary judgment motion.[16]

Third, the sole Sixth Circuit case relied on by St. John -- *Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005) – is clearly distinguishable.  In that case, the defendant police officers moved for summary judgment solely on the plaintiffs' Fourth Amendment claims.  *Bennett*, 410 F.3d at 816. The district court, however, granted summary judgment *sua sponte* to the defendant officers on *all* of plaintiffs' claims, including their Fourteenth Amendment claims.  *Id*.  On appeal, the plaintiffs argued that the district court abused its discretion in granting summary judgment *sua sponte* on the Fourteenth Amendment claims because plaintiffs did not have a proper opportunity to respond.  *Id*. The Sixth Circuit agreed, finding that "nothing gave the plaintiffs any notice that they would be forced to defend against a nonexistent motion by the defendants for summary judgment on the Fourteenth

---

[16] In support of their Motion for Summary Judgment, Defendants also cite to and rely on various documents, including the Lease, the Bed Bug Procedure, the door tag notice of the November 27, 2019 inspection, etc.  (Doc. No. 64.)  Each of these documents were marked as exhibits during St. John's deposition.  *See* Doc. No. 61-2 through 61-15.  St. John has not argued, or demonstrated, that any of these exhibits were not produced during discovery.

Amendment claims." *Id*. at 817.  Here, by contrast, this Court is not *sua sponte* granting summary judgment to Defendants on St. John's claims.  Rather, this Court addresses only those claims on which Defendants expressly move for judgment in their favor in their Motion for Summary Judgment. St. John, therefore, has had ample notice and opportunity to respond.  Accordingly, St. John's reliance on *Bennett* is misplaced.

Thus, and for all the reasons set forth above, the Court finds that St. John has failed to satisfy the requirements of Rule 56(d) or demonstrate that he has been subjected to "unfair surprise."  His request for additional discovery is, therefore, denied.

**B.      Materials Considered in Evaluating Defendants' Motion for Summary Judgment**

As noted above, both St. John and Defendants have objected to and/or moved to strike certain aspects of the others' summary judgment briefing.  In order to maintain a clear record, the Court will now address (1) St. John's Motion to Strike (Doc. No. 74); (2) Defendants' request to disregard St. John's October 6, 2023 Declaration in determining whether he has established a genuine issue of material fact regarding his § 1983 claims; and (3) St. John's unauthorized Sur-Reply (Doc. No. 75.)

**1.      St. John's Motion to Strike (Doc. No. 74)**

St. John asks this Court to strike the following statement in Defendants' Reply Brief: "[I]n May 2019, Plaintiff's lease was nearly terminated as a result of" difficulties CMHA encountered with St. John allowing CMHA to enter his Unit to conduct regular inspections, including bed bug inspections.  (Doc. No. 74, citing Doc. No. 70 at PageID# 1257.)  St. John asserts that this statement is "defamatory" and an "evil lie" that should be stricken from the record.  (Doc. No. 74 at p. 1.) Defendants failed to respond to St. John's Motion.

The Federal Rules of Civil Procedure "do not provide for a motion to strike documents other than pleadings." *McElwee v. Bryan Cowdery, Inc.*, 2023 WL 4423880 at *2 (S.D. Ohio July 10, 2023). *See also* Fed. R. Civ. P. 12(f) (limited to striking from pleadings or portions of pleadings "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"). "'Pleadings' are enumerated in Fed. R. Civ. P. 7(a) and the list does not include . . . briefs." *Stephenson v. Fam. Sols. of Ohio, Inc.*, 2021 WL 795551 at *5 (N.D. Ohio Mar. 2, 2021). "Instead, trial courts make use of their inherent power to control their dockets, when determining whether to strike documents or portions of documents." *Getachew v. Cent. Ohio Transit Auth.*, 2013 WL 819733 at *2 (S.D. Ohio Mar. 5, 2013) (citing *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516 (6th Cir. 2003)).

Motions to strike arguments are generally disfavored. "Rather than striking material, a court may simply ignore inadmissible evidence." *O'Banion v. Am. Aggregates Corp.*, 2020 WL 13469259 at *1 (S.D. Ohio July 23, 2020). A motion to strike is a "drastic remedy to be resorted to only when required for purposes of justice." *Gaskins v. Swope Ventures, Inc.*, 645 F.Supp.3d 682, 685 (W.D. Ky. 2022) (quoting *Hashemian v. Louisville Reg'l Airport Auth.*, 2013 WL 1788473 at *5 (W.D. Ky. Apr. 26, 2013)). *See also Texaco Inc. v. Bartel*, 2019 WL 13202319 at *2 (N.D. Ohio Aug. 15, 2019). The decision of whether to strike arguments presented at summary judgment lies within the trial court's sound discretion. *See McElwee,* 2023 WL 4423880 at * 2 (citing *Aerel S.R.L. v. PCC Airfoils, LLC,* 448 F.3d 899, 906 (6th Cir. 2006)).

For the following reasons, the Court declines to strike Defendants' argument that St. John's lease was "nearly terminated" in May 2019 because he had not cooperated in allowing CMHA to enter his Unit to conduct regular inspections. While St. John strongly disagrees with Defendants' argument, he has not demonstrated that it is "defamatory," scandalous, or otherwise so offensive as

29

to warrant striking it from Defendants' Reply Brief.  The Court will consider and weigh Defendants'

argument, as necessary, when it evaluates the parties' legal arguments regarding St. John's remaining

claims.  Accordingly, St. John's Motion to Strike (Doc. No. 74) is denied.

      **2.**      **Defendants' request to disregard St. John's October 6, 2023 Declaration**

The Court next considers Defendants' request that this Court disregard St. John's October 6,

2023 Declaration (Doc. No. 68) in determining whether St. John has established a genuine issue of

material fact regarding his § 1983 claims.  (Doc. No. 70 at fn. 1.)  Defendants first assert that St.

John's Declaration should be rejected as untimely because it was filed, without leave, two days after

St. John filed his Brief in Opposition to Defendants' summary judgment motion.  (*Id*.)  Defendants

further assert that St. John's Declaration is "not competent Civ. R. 56 evidence as it is largely

hyperbole laced argument and speculation that offers no fact-based testimony that would otherwise

be admissible in court." (*Id*.)

In his Declaration, St. John avers, under penalty of perjury, that he has "factual knowledge"

and "direct evidence" that "[t]he vicious and malicious attack on November 27, 2019 against [him]

stems from idle office gossip" that Defendant Page allegedly heard about him from CMHA

Administrative Assistant Roberta Cleveland.  (Doc. No. 68 at p. 1.)  St. John avers that, because of

this "false, fraudulent, and fabricated" gossip, Defendant Page "went on a mission" to show St. John

that "there was a new sheriff in town." (*Id*. at pp. 1-2.)  He avers that Page then "enlisted henchman

David Williams, Keith Allen (former co-workers) and Cornell Grimes and Tyshaune Harris" to

"participate in her illegal actions against" him.  (*Id.* at p. 2.)

The Court declines, in the exercise of its discretion, to "disregard" St. John's Declaration in

evaluating his § 1983 claims.  Although this Declaration was filed two days late, it was filed well

prior to Defendants' Reply Brief, thus allowing Defendants the opportunity to respond.  Given St. John's *pro se* status and the Court's preference for deciding issues on the merits, the Court is not inclined to disregard St. John's Declaration on the grounds that it is untimely.  The Court also declines to disregard St. John's Declaration on the grounds that its "content is not competent Civ. R. 56 evidence."  (Doc. No. 70 at fn 1.)  Defendants' entire argument on this point is one sentence. Defendants fail to sufficiently articulate why they believe the entirety of St. John's Declaration is inadmissible, or to cite and apply legal authority directly supporting their argument.[17]  Accordingly, the Court declines to disregard St. John's October 6, 2023 Declaration in evaluating the merits of Defendants' Motion for Summary Judgment.

### 3.    St. John's Unauthorized Sur-Reply

Defendants filed a Reply Brief in support of their Motion for Summary Judgment on October 18, 2023.  (Doc. No. 70.)  Sixteen days later, on November 3, 2023, St. John filed a "Reply to Defendants' Reply Brief" (hereinafter "St. John's Sur-Reply").  (Doc. No. 75.)  St. John's Sur-Reply is six pages in length and attaches several exhibits, consisting of a "General Affidavit" signed by St. John on November 3, 2023 and two unidentified photographs. (*Id.*) Defendants did not file a response.

The docket reflects that St. John did not seek leave to file his Sur-Reply.  This Court's CMC Order (a copy of which was mailed to St. John) expressly provides that "[n]o sur-reply brief may be filed without leave of Court."  (Doc. No. 32 at p. 2.)  Moreover, Local Rule 7.1 contemplates that when a party files a motion, the non-moving party must file an opposition, and the moving party may

---

[17] While Defendants cite *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994) for the general proposition that "only admissible evidence may be considered by the trial court ruling on a motion for summary judgment," Defendants fail to apply *Wiley* to the specific content of St. John's Declaration.  Nor do Defendants cite any legal authority supporting their assertion that an allegedly "speculative" affidavit should be disregarded during summary judgment proceedings.

then file a reply.  *See* N.D. Ohio Local Rules 7.1(c)–(e).  No additional briefing is authorized under this Court's Local Rules.  "[C]ourts agree that neither local rules …. nor the Federal Rules of Civil Procedure authorize a non-moving party to file a sur-reply, and that to file a sur-reply the party must obtain leave of the court."  *Eberhard v. Chicago Title Ins. Co.*, 2014 WL 12756822 at * 2 (N.D. Ohio Jan. 8, 2014) (collecting cases).  *See also Petrovic v. Untied States*, 2018 WL 4959031 at * 3 (6th Cir. June 8, 2018) ("We affirm the district court's decision to strike his sur-reply because the district court did not abuse its discretion, considering the relevant local rule does not allow sur-replies and Petrovic did not seek leave to file one.").

For the following reasons, the Court declines to consider St. John's unauthorized Sur-Reply and its attachments.  While the Court is mindful of St. John's *pro se* status, the Court has repeatedly reminded him of his obligation to understand and follow this Court's rules.  As noted above, neither the Northern District of Ohio's Local Rules nor the CMC Order entered in this case permit the filing of a sur-reply absent leave of Court.  If St. John felt that a sur-reply was warranted or necessary, he could (and should) have filed a Motion for Leave.  St. John failed to do so.  Instead, and without obtaining this Court's permission, he filed a six-page brief raising a host of factual and legal arguments and attaching an entirely new Affidavit and documentary exhibits.  This was inappropriate and in direct contravention of this Court's rules.

Accordingly, and pursuant to its inherent authority to control its docket, the Court will not consider St. John's Sur-Reply in evaluating Defendants' Motion for Summary Judgment.[18]  *See*

---

[18] The Court recognizes that sur-replies "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'"  *Key v. Shelby County*, 551 Fed. Appx 262, 265 (6th Cir. 2014) (quoting *Seay v. TVA*, 339 F.3d 454, 481 (6th Cir. 2003)).  Here, however, St. John fails to identify any new arguments or issues that he believes were raised for the first time in Defendants' Reply Brief.  Rather, St. John's Sur-Reply addresses factual and legal arguments that were

*Ordos City Hawtai Autobody Co. v. Dimond Rigging Co*., 695 Fed. Appx 864, 870-72 (6th Cir. 2017) (finding that a court acts within its discretion when it strikes a filing for failing to comply with the local rules); *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp., a Div. of Reed Elsevier Grp., PLC*, 463 F.3d 478, 488 (6th Cir. 2006) ("The district court does not have to accept every filing submitted by a party.").

### C.    Section 1983 Claims

In his Amended Complaint, St. John alleges the following "police misconduct" claims against Defendants Page, Grimes, and Harris pursuant to 42 U.S.C. § 1983: (1) unlawful entry (Count III); (2) warrantless entry (Count IV); (3) unlawful search and seizure (Count V); and (4) excessive force (Count VI.)[19]  (Doc. No. 1 at pp. 18-23.)  The Court will first address Defendants' argument that Defendant Page is entitled to summary judgment in her favor on St. John's § 1983 claims because she was not acting under color of state law when she participated in the inspection of St. John's Unit on November 27, 2019.  The Court will then proceed to address Defendants' arguments that they are entitled to qualified immunity with respect to each of St. John's § 1983 claims.

### 1.    State Actor

---

clearly raised in Defendants' Motion for Summary Judgment, to which he had the opportunity to respond in his Brief in Opposition.  As such, this Court views St. John's Sur-Reply as nothing more than "an impermissible attempt to have the last word."  *Attractive Surgical, LLC v. Cleveland Clinic Found*., 2019 WL 11075734 at *4 (N.D. Ohio Oct. 31, 2019).

[19] Defendants assert that "Plaintiffs' Amended Complaint does not allege a claim against Defendants in their official capacities." (Doc. No. 64 at p. 2, fn 2.)  St. John does not acknowledge or address this assertion in his Brief in Opposition. The Court has carefully reviewed the Amended Complaint and finds no indication therein that St. John has asserted any official capacity claims against Defendants Page, Grimes, and/or Harris.  Accordingly, and in light of St. John's lack of opposition on this issue, the Court finds that the only remaining § 1983 claims in this action are St. John's individual capacity claims against Defendants Page, Grimes, and/or Harris.  *See Brown v. VHS of Michigan, Inc.,* 545 Fed. Appx 368, 372 (6th Cir. 2013) (finding that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.")

Defendants first assert, summarily and without citation to any legal authority, that "Defendant Page is neither a police officer nor was she acting under color of state law on November 27, 2019." (Doc. No. 64 at pp. 7-8.) Defendants argue that "as such, Plaintiff cannot state a claim against Page as a matter of law" and St. John's § 1983 claims against her should be dismissed. (*Id.*) St. John fails to address this argument in his Brief in Opposition. (Doc. No. 66.)

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that (1) he was deprived of a right secured by the Constitution or the laws of the United States, and (2) the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). The Sixth Circuit has interpreted the second requirement, often called the "state action requirement," to mean that a defendant "must be acting in a state capacity to be liable under the statute." *Lindke v. Freed*, 37 F.4th 1199, 1202 (6th Cir. 2022). *See also Blackwell v. Allen*, 2022 WL 17832191 at * 3 (6th Cir. Dec. 21, 2022).

The determination of whether a defendant constitutes a "state actor" for purposes of § 1983 can be a complicated one. The Supreme Court has identified three tests for discerning whether a private party's conduct is attributable to the state: (1) the public-function test, (2) the state-compulsion test, and (3) the nexus test. *Lindke*, 37 F.4th at 1202 (citing *Lugar v. Edmondson Oil Co., Inc*, 457 U.S. 922, 939 (1982) and *Chapman v. Higbee Co*., 319 F.3d 825, 833 (6th Cir. 2003)). "Under the public function test, a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state." *Chapman*, 319 F.3d at 833. The state-compulsion test requires that the state "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky v. Huhn*,

960 F.2d 1331, 1335 (6th Cir. 1992).  Finally, under the nexus test, a plaintiff must demonstrate that "there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman*, 319 F.3d at 834.  To make this determination, courts ask whether a defendant's actions are either subject to the government's "management or control" or "entwined with governmental policies." *Lindke,* 37 F.4th at 1203 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

The Sixth Circuit applies the "state official test" when asking whether a *public* official was acting in his state capacity. *Lindke,* 37 F.4th at 1202. This test "asks whether the official is 'performing an actual or apparent duty of his office,' or if he could not have behaved as he did 'without the authority of his office.'" *Id*. (quoting *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001)).  This is a version of the "nexus test" discussed above.  *Id*. (explaining that "the state-official test is how we apply the nexus test when the alleged state actor is a public official.")

Here, Defendants fail to cite, apply, or discuss any legal authority in connection with their argument that Defendant Page does not constitute a "state actor" for purposes of St. John's § 1983 claims.  (Doc. No. 64 at pp. 7-8.) Defendants do not explain (or cite any legal authority regarding) whether, as a CMHA site manager, Page was acting as a private party or a public official when she participated in the November 27, 2019 inspection of St. John's Unit.  Nor do Defendants provide an analysis or discussion of any of the various tests used by the Sixth Circuit to determine whether a defendant has acted "under color of state law."  To the contrary, Defendants' entire argument on this

issue consists of three sentences with no citation to any legal authority.[20]  In sum, Defendants have failed entirely to develop this argument, leaving this Court to guess at either its factual or legal basis.

It is well established that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey,* 125 F.3d 989, 995 (6th Cir. 1997); *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (same).  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones." *McPherson*, 125 F.3d at 995.  Here, the Court finds that, by failing to provide any meaningful discussion of this issue, or citation to legal authority, Defendants have waived their argument that Defendant Page was not acting under color of state law for purposes of St. John's § 1983 claims.  Accordingly, the Court will not consider this argument herein.

### 2        Qualified Immunity

As noted above, Defendants maintain that they are entitled to qualified immunity with respect to St. John's § 1983 claims for unlawful/warrantless entry, unreasonable search and seizure, and excessive force.  (Doc. No. 64 at pp. 8-11.)  Government officials "are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). To determine whether a government official is entitled to qualified immunity, courts "apply a well-

---

[20]  In one of those sentences Defendants assert that Page is entitled to judgment in her favor on this basis because St. John "conceded" that she was not a police officer or acting under color of state law during his deposition.  (Doc. No. 64 at p. 7.)  This argument is without merit.  As an initial matter, St. John did not "concede" in his deposition that Page was not acting under color of state law.  Rather, he simply testified that he thought Page was a site manager, and not a police officer.  (St. John Depo. at Tr. 206.)  A government official, however, does not necessarily have to be a police officer to constitute a "state actor" for purposes of § 1983.  Moreover, the question of whether Defendant Page was acting under color of state law when she entered his Unit to conduct the bed bug inspection on November 27, 2019 is a legal question.  It is not something which St. John "conceded" while testifying (*pro se* and without the assistance of counsel) during his deposition.

established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the [official]'s conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id.* These steps may be addressed in any order, and the defendant official need only prevail on one of them to be granted qualified immunity. *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable government official would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). As the Supreme Court explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ----, ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034.

*Id*. at 63. Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the particular situation that [the defendants] confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous,* 953 F.3d 402, 407 (6th Cir. 2020).

The Court will address whether Defendants are entitled to qualified immunity with respect to each of St. John's §1983 claims separately, below.

a. **Unlawful/Warrantless Entry (Counts III and IV)**

In Counts III and IV of the Amended Complaint, St. John alleges that Defendants Page, Grimes, and Harris violated his Fourth Amendments rights when they entered his Unit on November 27, 2019 without a warrant. (Doc. No. 1 at pp. 18-23.) The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend IV. Although the text of the Fourth Amendment does not specify when a warrant must be obtained, the Supreme Court has "inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). The Supreme Court has also explained that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972). *See also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

38

Therefore, "[i]t is a 'basic principle of Fourth Amendment law'" that it is "presumptively unreasonable" for a government official to enter a private home without a warrant. *Payton*, 445 U.S. at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). *See also Clemons v. Couch*, 3 F.4th 897, 902 (6th Cir. 2021); *Smith v. Stoneburner*, 716 F.3d 926, 930 (6th Cir. 2013). But "the Fourth Amendment does not prohibit all unwelcome intrusions 'on private property,'—only 'unreasonable' ones." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (quoting *Jardines*, 569 U.S. at 6). Accordingly, even for entry into a home, "the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006). *See also Clemons,* 3 F.4th at 902; *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021).

Here, it is undisputed that Defendants did not have a warrant when they entered St. John's Unit on November 27, 2019. Defendants assert, however, that they did not need one, arguing as follows:

> While a warrantless search and seizure of a home is unconstitutional, [] Grimes and Harris did not enter Plaintiff's unit to conduct a search and seizure. Instead, they were only serving as an escort to Page and the maintenance employees to conduct a bed bug inspection. Plaintiff admitted that Defendants did not need a warrant to conduct a bed bug inspection. (Doc. No. 61-1 at PageID#743-744.) Moreover, it is undisputed that Plaintiff gave Defendants consent to enter his unit. So, even if Defendants were required to obtain a warrant to obtain a bed bug inspection, which they were not, it is well established that consent by an individual with apparent authority is an exception to the warrant requirement. *Leavell v. City of Sandusky*, N.D. Ohio 3:14CV1420, 2016 WL 5076083.

(Doc. No. 64 at p. 10.) In response, St. John argues that "the law was clearly established at the time of entry that a warrantless entry into a private dwelling, absent of exigent circumstances, is unlawful." (Doc. No. 66 at p. 23.) He also asserts that he did not give either Officer Grimes or Officer Harris permission to enter his Unit. (*Id.* at p. 18.) St. John argues that Officers Grimes and Harris "threatened Plaintiff to step back away from the door or 'this is going to be the worst day of your life.'" (*Id.*)

39

Finally, St. John correctly asserts that Officer Grimes told Defendant Page that he and Harris could not "use keys to access the apartment without a warrant," which St. John argues shows that Officers Grimes and Harris had "full knowledge that they were violating the law" when they entered his Unit without his voluntary consent.  (*Id.*)

### i.  Consent

The Court first considers Defendants' argument that St. John consented to their warrantless entry into his Unit.  A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  The consent "must be 'voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *Andrews v. Hickman County, Tenn*. 700 F.3d 845, 854 (6th Cir. 2012) (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir.2009)).  The burden to establish that the exception applies is on the government official invoking consent. *See Andrews,* 700 F.3d at 854.

Here, Defendants' argument that St. John consented to their entry into his Unit appears to be predicated on Article XI of the Lease, which provides, in relevant part, that "Resident agrees that a duly authorized CMHA agent, employee, or representative shall be permitted to enter Resident's unit during reasonable hours (8:00 a.m. to 5:00 p.m.) to perform routine maintenance and/or inspections …., to make repairs or improvements, or for any other necessary reason." (Doc. No. 62-1 at PageID# 968.)  This provision also states that "other than in emergency situations, CMHA will give forty-eight hour notice before it will enter the unit to affect [sic] repairs…."  (*Id.*)

St. John acknowledged in his deposition that he signed the Lease and that the Lease contains this provision.  (St. John Depo. at Tr. 44, 65-67.)  *See also* Doc. No. 61-2 at PageID# 980.  He also

acknowledged that, on November 22, 2019 (five days before the warrantless entry at issue), CMHA provided placed a door tag on his Unit advising him of the scheduled bed bug inspection on November 27, 2019. (St. John Depo. at Tr. 165-166.) *See also* Doc. No. 66 at p. 13. St. John identified the door tag during his deposition. (St. John Depo. at Tr. 165-166) As noted *supra*, the tag is labeled "Maintenance" and states in a handwritten notation that "Management will be in your Unit Wednesday November 27 for Bed Bug Inspection." (Doc. No. 61-10 at PageID# 994.)

For the following reasons, the Court finds that Defendant Page has demonstrated that there is no genuine issue of material fact that St. John consented to her entry into his Unit on November 27, 2019 to conduct a bed bug inspection. As an initial matter, St. John conceded that CMHA placed the door tag on his door on November 22, 2019 and that he received it.[21] (Doc. No. 66 at p. 13; St. John Depo. at Tr. 165-166.) Moreover, although St. John testified in deposition that he believed that only Terminix employees would enter his Unit for the inspection (St. John Depo. at Tr. 168), the door tag clearly states that "*Management* will be in your Unit Wednesday November 27 for Bed Bug Inspection." (Doc. No. 61-10 at PageID# 994) (emphasis added). St. John does not dispute that, as Site Manager for Beachcrest, Defendant Page is clearly "management."

Thus, the Court finds that Defendant Page provided proper notice under the Lease, including notice that "management" would be in his Unit on November 27, 2019 for the inspection. Moreover, St. John does not argue (and there is no evidence) that a bed bug inspection would not fall within the

---

[21] St. John suggests that placing the door tag on his door "is not the correct and professional and appropriate way notices are written and issued." (Doc. No. 66 at p. 15.) He further asserts that, pursuant to Article XI of the Lease, notice is supposed to be placed under the resident's door, not on the resident's door. (*Id*. at p. 16.) This argument is without merit. Article XI of the Lease provides that notice "*may* be placed under Resident's door." (Doc. No. 61-2 at PageID# 968) (emphasis added). On its face, the Lease does not require that notice be placed under Resident's door. And, here, St. John acknowledges that the notice (in the form of the door tag) was placed on his door on November 22, 2019 and that he received it on that date. *See* Doc. No. 66 at p. 13.

above Lease provision and/or that Defendant Page otherwise exceeded the scope of St. John's consent when she entered his Unit on November 27, 2019 and conducted a bed bug inspection.  Notably, St. John does not direct this Court's attention to any legal authority demonstrating that, under the circumstances presented, the Lease provision at issue is insufficient to confer consent.

Based on the above, the Court finds that there is no genuine issue of material fact that St. John consented to Defendant Page's entry into his Unit on November 27, 2019 to conduct a bed bug inspection.  The Court further finds that St. John has, therefore, failed to show that Page violated his Fourth Amendment rights when she entered his Unit on that date.  *See, e.g., Hall v. Sweet*, 666 Fed. Appx.469 (6th Cir. 2016) (by signing and submitting license renewal application, home childcare operator gave consent for state regulators to search her home without a warrant). Moreover, even assuming *arguendo* that there was a constitutional violation, St. John has not argued or directed this Court's attention to any Supreme Court or Sixth Circuit authority that it was clearly established in November 2019 that Defendant Page's entry into his Unit violated his Fourth Amendment rights under the circumstances presented herein.  Specifically, in light of St. John's agreement to the Lease provisions, including Article XI, as well as his acknowledgement of CMHA's Bed Bug Procedure, the Court finds that "it cannot be said that [Defendant Page was] plainly incompetent or in knowing violation of the law" when she entered St. John's Unit to conduct the properly noticed bed bug inspection on November 27, 2019.  *See Hall*, 666 Fed. Appx. at 479.  Accordingly, and for all the reasons set forth above, the Court finds that Defendant Page is entitled to qualified immunity with respect to St. John's warrantless/unlawful entry claims in Counts III and IV of the Amended Complaint.

The Court is not convinced, however, that St. John consented to Officers Grimes' and Harris' entry into his Unit on November 27, 2019. Defendants cite no authority, and the Court is not persuaded, that Article XI of the Lease can reasonably be read so broadly to include law enforcement officers such as Officers Grimes and Harris. And, as St. John correctly notes, Officer Grimes seems to himself acknowledge that there are limits to what he is permitted to do without a warrant. Officer Grimes averred in his Declaration that he explained to Page that "we were only there to provide her an escort, and that we could not use keys to access the apartment without a warrant." (Grimes Decl. at ¶ 4.) In the Court's view, this demonstrates an acknowledgment by Officer Grimes that, as a police officer, he was not authorized to enter a Resident's Unit solely on the basis of Article XI of the Lease.

The Court is also not persuaded that St. John voluntarily consented to Officer Grimes and Officer Harris' entry on November 27, 2019. Although St. John testified that he opened the door and let Defendants into his Unit, he also clearly testified that he felt threatened and coerced to do so. Specifically, St. John testified that, when he started arguing with Defendant Page at the door to his Unit, Officer Grimes became "irate and belligerent," put his hands on his gun and Taser, and screamed "this is going to be the worst day of your life if you don't move out of the way." (St. John Depo. at Tr. 195, 203-204, 254, 265.) *See also* Doc. No. 61-10 at PageID# 1001. As noted above, it is well established that consent must be "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248. *See also United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is a 'question of fact to be determined from the totality of all of the circumstances.'" *Carter*, 378 F.3d at 587 (quoting *Schneckloth*, 412 U.S. at 227.) Thus, the Court

43

rejects Defendants' argument that Officers Grimes and Harris are excused from the warrant requirement based on the consent exception.  Unless another exception applies, Officers Grimes and Harris would not be entitled to qualified immunity with respect to this claim.

### ii.  Community Caretaker Exception

By referencing the fact that Officers Grimes and Harris were "only serving as an escort," Defendants' Motion could be interpreted as raising the "community caretaking exception" to the warrant requirement.  This exception was first announced in *Cady v. Dombrowski*, 413 U.S. 433 (1973).  In *Cady,* the Supreme Court held that a police officer's warrantless search of a vehicle did not violate the Fourth Amendment.  The searched vehicle had been involved in an accident, and after towing it to a temporary holding lot, an officer opened and inspected the trunk, suspecting that a weapon might be present.  *Id*. at 443.  In holding that the officer's search was reasonable, the Court discussed the "community caretaking functions" that officers are often responsible for, such as attending to vehicle accidents on public highways.  *Id*. at 441. It concluded that police activity in furtherance of community-caretaking functions—at least in the motor-vehicle context—does not offend the Fourth Amendment so long as it is executed in a reasonable manner pursuant to "state law or sound police procedure." *Id*. at 447–48.

After *Cady,* the scope of the community caretaker exception was unclear.  Prior to 2021, Circuits Courts of Appeals generally recognized the exception as to vehicle searches but were split regarding whether the exception applied to warrantless entries and searches of private homes.[22]  In

---

[22] In *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 556-557 (7th Cir. 2014), the Seventh Circuit summarized the pre-2021 split as follows: "The other circuits are divided on the question of whether the community caretaker exception applies outside of the automobile context, and in particular to warrantless searches of the home. In addition to this circuit, the Third, Ninth, and Tenth circuits have confined the community caretaking exception to the automobile context. *See Ray v. Tp. of Warren*, 626 F.3d 170, 177 (3d Cir.2010); *United States v. Bute*, 43 F.3d 531, 535 (10th Cir.1994) (2–1

1996, the Sixth Circuit applied the community caretaker exception to police officers' warrantless entry into a private home in response to a loud noise complaint in the middle of the night. *United States v. Rohrig*, 98 F.3d 1506, 1521-1525 (6th Cir. 1996). The Sixth Circuit, however, emphasized the "fact specific nature of "its holding and stated that "we do not mean to fashion a broad 'nuisance abatement' exception to the general rule that warrantless entries into private homes are presumptively unreasonable." *Id*. at fn 11. Rather, the Court "simply find[s] that, in some cases, it would serve no Fourth Amendment purpose to require that the police obtain a warrant before taking reasonable steps to abate an immediate, ongoing, and highly objectionable nuisance." *Id*.

In 2003, however, the Sixth Circuit expressed some skepticism about extending this exception to warrantless entries into private homes. *See United States v. Williams*, 354 F.3d 497 (6th Cir. 2003). In *Williams*, a rental property owner (Theresa Smith) suspected a water leak in the defendant tenant's residence and entered the property with her niece (Lucille Barnett) to look for a leak. *Id*. at 500. Once inside, Smith and Barnett noticed a strange smell and saw leaves all over the floor and no furniture. *Id*. Concerned about possible drug activity and afraid for their safety, Smith and Barnett asked police officers to accompany them to the residence to continue checking for a water leak. *Id*. The officers accompanied Smith and Barnett into defendant's residence without a warrant when defendant was

---

decision); *United States v. Erickson*, 991 F.2d 529, 531–33 (9th Cir.1993). In contrast, the Fifth, Sixth, and Eighth circuits have relied on the community caretaking exception to justify warrantless searches of the home. *See United States v. Quezada*, 448 F.3d 1005, 1007–08 (8th Cir.2006); *United States v. Rohrig*, 98 F.3d 1506, 1521–25 (6th Cir.1996) (2–1 decision); *United States v. York*, 895 F.2d 1026, 1029–30 (5th Cir.1990) (framed as an exigent circumstances decision, but stressing community caretaking role of police in abating noise disturbance). However, the Sixth Circuit more recently has expressed doubt that the community caretaking doctrine would generally authorize the warrantless entry into a home, *see United States v. Williams*, 354 F.3d 497, 508 (6th Cir.2003), although its decision in that case ultimately rested on the fact that police were motivated by a suspicion of criminal wrongdoing in addition to community caretaking purposes, *id*. Finally, the Fourth Circuit has indicated that the community caretaking exception may justify a warrantless residential search when, as in *Cady*, the search is conducted pursuant to routine procedure and not for purposes of criminal evidence-gathering. *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir.2009)."

45

not present, inspected the entire residence, and found a large amount of marijuana plants. *Id*. at 501.

The *Williams* court distinguished *Rohrig* and found the community caretaker exception did not apply:

> *Rohrig* involved an 'immediate, ongoing, and highly objectionable nuisance,' while this case involves no nuisance at all. The possible water leak in this case posed no threat or nuisance to any member of the public. Rather, the agents in this case were concerned with protecting one woman while she abated potential damage to her carpet. Despite Smith's speculative concerns, there is no immediacy in this case. Moreover, in *Rohrig*, time was 'of the essence.' *Id*. at 1521. There, the officers were confronted with a loud noise, which could be heard from a block away. Unable to sleep, angry neighbors sought the immediate assistance of the police. Were the officers to seek a warrant, the noise would have 'continued unabated for a significant period of time.' *Id*. In contrast, in this case, time was hardly of the essence in abating the possible water leak. The agents in this case were not called to the Bluegrass residence in the middle of the night by frantic neighbors. Rather, as noted previously, Smith and Barnett made an appointment to meet with them concerning the possible water leak and their suspicion of drug activity.
>
> The *Rohrig* Court concluded that there was a compelling governmental interest involved there because the police officers were performing a 'community caretaking function' when they sought to abate the nuisance. Acknowledging that looking to the severity of the offense committed, as the Supreme Court did in *Welsh*, suggests that no vital government interest was served by the warrantless entry to quell a disturbing noise, the *Rohrig* court concluded that, 'the *Welsh* analysis has less relevance as one moves away from traditional law enforcement functions and toward what the Supreme Court has referred to as 'community caretaking functions.'' *Rohrig*, 98 F.3d at 1521. *Rohrig* focused, however, on the fact that the officers in that case had only a limited purpose—abating the nuisance—and were not 'questioning a subject or searching for evidence of a suspected offense.' *Id*.
>
> Here, the agents' motives in entering were arguably not as pure. The agents testified that Agent Henderson entered the apartment in his capacity as a member of the local Sheriff's Department and not as a federal agent. However, the agents in this case were called to the Bluegrass residence in their capacity as DEA agents. Smith and Barnett had explained over the telephone that they suspected drug activity in the house and described the smell and leaves in the residence. The officers too suspected drug activity prior to the entry. Thus, although the officers ostensibly entered the home to assist Smith, they were also suspicious, if not convinced, that drug-related activity was taking place inside the residence before they entered without a warrant. Unlike the entry in *Rohrig*, the entry in this case cannot be said to have been solely related to Agent Henderson's 'community caretaking function.' Thus, even if we apply *Rohrig*'s conclusion that the warrant requirement is implicated to a 'lesser degree' when police officers act in their roles as community caretakers, *id*. at 1523, it is not clear that the

46

officers were acting solely in this capacity here. The community caretaking function of the police cannot apply where, as here, there is significant suspicion of criminal activity. As the Supreme Court has explained, the community caretaking function of the police applies only to actions that are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' *See Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Additionally, **despite references to the doctrine in *Rohrig*, we doubt that community caretaking will generally justify warrantless entries into private homes.**

*Williams*, 354 F.3d at 507-508 (emphasis added).

The Sixth Circuit revisited the community caretaker exception again in 2009, in *United States v. Washington*, 573 F.3d 279 (6th Cir. 2009).  In that case, a landlord requested that police officers patrol his apartment building because he had observed a large number of non-resident "trespassers" in the building.  *Id*. at 281.  The building was known to police as "the site of frequent drug arrests and activity."  *Id*.  The landlord noted that one of the apartments was owned by George Young, who had been arrested and was incarcerated.  *Id*.  The landlord said that he had been told there was a lot of foot traffic in Young's apartment, including one man entering with a gun.  *Id*.  The landlord stated that, in light of Young's arrest, no one was permitted in the Unit.  *Id*.  In fact, Young's nephew (Defendant Washington) had been living in the apartment for several months.  *Id*.

A few days after speaking with the landlord, the police noticed activity in Young's apartment and decided to investigate.  *Id*.  Officer Rock knocked on the door, in response to which someone opened the door and Officer Rock entered the apartment.  *Id*. at 282.  Defendant Washington was visible.  He became belligerent and told Officer Rock to leave.  *Id*.  Once Officer Rock was inside the apartment, he saw drug paraphernalia.  *Id*.  Officer Rock told Washington that he was suspected of criminal trespass and patted him down.  *Id*.  Officer Rock's search revealed a gun and a crack pipe. Washington was charged as a felon in possession.  *Id*.  He moved to suppress the evidence resulting

47

from Officer Rock's search. *Id.* The district court granted the motion to suppress, and the government appealed. *Id.*

The Sixth Circuit affirmed. Among other things, the court distinguished *Rohrig,* finding in relevant part as follows:

> In *Rohrig*, the exigency stemmed from an ongoing injury to the community, even if not resulting in any physical harm. In this case, however, the facts at best evidence the vague potential for harm to persons or property as opposed to an imminent or ongoing harm. Even factoring in reports from days earlier that firearms were present, officers had no reason to believe anyone on the scene intended to use a gun on the property or that those present were stealing Young's possessions or ransacking the apartment. And that Young was in jail meant that he could not be held hostage.

> To be fair, the potential danger posed by drug trafficking and drug traffickers is greater than a loud stereo, and Washington's neighbors and landlord no doubt found the additional foot traffic and unsavory characters traveling to and from the unit irksome if not frightening. But the government misreads our caselaw in positing that the rationale of *Rohrig* must therefore extend to the case at bar. [] **When people may have the capacity to harm others, but are not engaged in an inherently dangerous activity, officers cannot lawfully dispense with the warrant requirement. An ongoing nuisance that results in non-physical harm to others may constitute an exigency. However, the mere possibility of physical harm does not.**

> It is certainly within our authority to identify new circumstances in which an exigency exists even if they fall outside of the traditional categories, as we have done in cases involving community caretaking such as when a warrantless home-entry is the only way for the police to put an immediate stop to an ongoing nuisance. *Rohrig*, 98 F.3d at 1519. **To conclude that even when police cannot identify any ongoing injury to the community they may search homes without warrants would not merely go further than our previous cases, it would contradict Supreme Court precedent.** ***

> If we were to permit a warrantless home entry under these circumstances, which were not urgent or life threatening, the effect would certainly undercut making 'the presumption of unreasonableness ... difficult to rebut.' *Ibid.* Rather, it would allow police officers on the scene to cloak themselves in judicial robes even when there is no immediate and serious consequence to waiting for the approval of a neutral and detached magistrate. For this reason, **we hold that the community caretaker exception does not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large.**

*Washington*, 573 F.3d at 288-289 (emphasis added).

In 2021, the Supreme Court revisited the community caretaker exception and clarified that *Cady* does not create a "standalone doctrine that justifies warrantless searches and seizures in the home." *Canigilia v. Strom*, 593 U.S. 194, 196 (2021). The Sixth Circuit recently addressed *Caniglia* in *Clemons v. Couch*, 3 F.4th 897 (2021). In that case, Christina Clemons had been living with her husband and son in her in-laws' home. *Id.* at 900. Christina filed for divorce, which caused tensions between herself and her in-laws. *Id.* On March 25, 2016, Christina and her mother-in-law Evalee got into a physical altercation. *Id.* Christina's father-in-law Richard told Christina to leave, which she did. *Id.* Two days later, Christina went to the police station with her mother and requested a law-enforcement escort to accompany her to her in-laws' home so she could retrieve some of her and her son's belongings. *Id.* Christina said she was afraid to go back to the residence by herself because her in-laws had threatened her. *Id.*

Trooper Couch was assigned to accompany Christina and her mother. *Id.* They arrived at the Clemons' house and let themselves in. *Id.* Richard and Evalee were upset and became hostile as Christina went to retrieve her possessions. *Id.* Richard told Trooper Couch to leave, but Couch "would have none of it." *Id.* According to Richard, Trooper Couch "just stood there" and demanded that Richard "sit down and shut up." *Id.* Christina finished collecting her belongings and exited the house, with Trooper Couch following behind her. *Id.* at 901. As they were exiting, Richard insulted Trooper Couch, in response to which Trooper Couch started "clobbering him." *Id.* The two began to fight, and then Evalee and her son Dustin joined in. *Id.* Trooper Couch deployed his taser to subdue Richard and Dustin, and arrested Richard, Evalee, and Dustin. *Id.* They were charged with various offenses, but a grand jury declined to issue an indictment. *Id.*

Richard later filed a § 1983 action against the Kentucky State Police and Trooper Couch, alleging claims for wrongful entry, excessive force, wrongful arrest, deliberate indifference, failure to train, and various state law claims.  *Id*.  Trooper Couch moved for summary judgment, arguing he was entitled to qualified immunity.  *Id*.  The district court granted summary judgment to Trooper Couch on the warrantless entry claim based on the community caretaker exception. *Id*. The case proceeded to trial, however, on Richard's wrongful arrest and excessive force claims. *Id*. The jury returned a verdict in favor of Trooper Couch on these claims.  *Id*. at 902.  Richard then appealed the district court's summary judgment ruling that Couch was entitled to qualified immunity on his unlawful entry claim.  *Id*.

The Sixth Circuit reversed and remanded for further proceedings.  The court first found that "*Caniglia* makes clear that Couch cannot justify his warrantless entry into Richard's home by calling on the community caretaker exception."  *Id*. at 903.  Thus, "without any other valid justification for his entry, we hold that Couch violated Richard's Fourth Amendment rights." *Id*. The Sixth Circuit then found that Richard's constitutional right was clearly established at the time of the alleged violation.  *Id*. at 903-904.  The Court explained:

> We now know, based on *Caniglia*, that the community-caretaker exception, to the extent it exists at all, does not apply to the home. *Caniglia,* 141 S. Ct. at 1598. But *Caniglia,* of course, had not been decided by the date of the events in question, March 27, 2016. At that time, a reasonable officer in Couch's position could have determined—based on *Cady*, and our pre-2016 precedent interpreting *Cady*—that the community-caretaker exception applied to an officer's home entry, at least as a general matter. *See Rohrig*, 98 F.3d at 1523 (noting, in the context of a warrantless home entry, that the warrant clause is 'implicated to a lesser degree' when a police officer is engaged in community caretaking); *United States v. Washington*, 573 F.3d 279, 286–89 (6th Cir. 2009) (assuming without deciding that the exception applies to the home). *But see United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) ('[W]e doubt that community caretaking will generally justify warrantless entries into private homes.').

50

**That does not, however, absolve Couch of potential liability. For it was clearly established before March 27, 2016, that if the exception applied to home entry, it could 'not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large.'** *Washington*, 573 F.3d at 289; *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019) (reiterating that requirement three years after Couch's warrantless entry). That principle made clear that Couch's actions could not fall within the community-caretaker exception.

Couch may have been engaged in community caretaking when he accompanied Christina to collect her and her son's belongings. Christina was afraid to go to the Clemonses' house alone, perhaps for good reason, and Couch was her requested escort. **But the need for entry was not urgent. Construing the facts in the light most favorable to Richard, any delay in Couch's entry into the residence—to obtain a warrant or court order permitting his entry—was not 'reasonably likely to result in injury or ongoing harm to the community at large.'** *Washington*, 573 F.3d at 289. We decline to hold that sufficient injury would have or could have resulted if Christina had been forced to delay the collection of her and her son's belongings. True, the son was to attend school the next day and required his school supplies and attire, but that type of harm does not reach the level of harm required by *Washington* to permit the state's warrantless entry into Richard's home. *Id*.

Notably, Couch does not even contend that a delay was reasonably likely to result in injury or ongoing harm to the community at large. Perhaps he declines to do so because the injury or harm in this case was more speculative and personal, and thus unlike the injury or harm used to justify the exception's application to the home in other cases. *See, e.g., Rohrig*, 98 F.3d at 1522 (finding loud music blaring at 1:30 AM to be a public nuisance that justified warrantless entry and search of home).

The facts in this case more closely mirror those in cases where we refused to apply the community-caretaking rationale to warrantless home entry. *See Goodwin v. City of Painesville*, 781 F.3d 314, 331 (6th Cir. 2015) (holding that an argument between two individuals in and around a private residence that lasted a short time was not 'the type of ongoing and overbearing public disturbance that would give rise to the necessity for immediate action'); *see also McGraw v. Madison Township*., 231 F. App'x 419, 425 (6th Cir. 2007) (no justification for warrantless entry where the alleged breach of the peace—a boisterous argument among individuals in their home—had ended). In those cases, as here, when law enforcement entered the plaintiffs' house, there was no ongoing public disturbance or harm to the community at large. Couch cannot ignore the limits of the community-caretaker exception as stated in *Washington*.

Nor can he simply distinguish *Washington* on its facts. His attempt to do so does not nullify our description of the contours of the community-caretaker exception in that case, where, as here, an officer entered an individual's home without a warrant and

despite the individual's repeated objections. Neither does Couch's citation to out-of-circuit precedent.

*Id*. at 904-905 (emphasis added) (footnotes omitted). Thus, the Sixth Circuit found that Trooper Couch was not entitled to qualified immunity and remanded for further proceedings.

For the following reasons, the Court finds that Officers Grimes and Harris are not entitled to qualified immunity with respect to St. John's unlawful/warrantless entry claim.  First, given *Canigilia* and *Clemons*, it is clear that Officers Grimes and Harris' warrantless entry into St. John's Unit violated his Fourth Amendment rights.  Thus, the only remaining question is whether that right was "clearly established" in November 2019.  Under *Clemons* and *Washington*, that inquiry turns on whether "delay [was] reasonably likely to result in injury or ongoing harm to the community at large." *Washington*, 573 F.3d at 289.  *See Clemons*, 3 F.4th at 904.

Here, Defendant Page avers that she requested the police escort (1) because St. John had previously refused to open his door for maintenance to conduct bed bug inspections; and (2) for her safety and the safety of her staff.  (Page Decl. at ¶ 4.)  As for the first reason, there is no evidence (and Defendants do not argue) that delaying the bed bug inspection would result in injury or harm to the "community at large."  While bed bugs are certainly a nuisance, Defendants have not introduced any evidence that delaying the inspection would have caused harm to St. John's neighbors.[23]  Indeed, Defendants waited five (5) days from the unsuccessful November 22, 2019 inspection to conduct the inspection that it at issue herein, belying any indication that of the type of urgency required by *Washington*. As for the second reason, St. John correctly notes that there is no evidence (and

---

[23] It is undisputed the November 27, 2019 inspection of St. John's Unit found no evidence of bed bugs.

Defendants do not argue) that he had a history of violence or that Page had any reason to suspect that he owned a weapon.

The Court also emphasizes that Defendants have not cited any authority either that there was no constitutional violation under the circumstances presented, or that Officers Grimes and Harris could have reasonably believed in November 2019 that their warrantless entry into St. John's Unit for purposes of facilitating a bed bug inspection was lawful. (Doc. No. 64 at p. 10.) Notably, while Defendants rely heavily on the Lease, they have not directed this Court's attention to any authority that would support their assertion that the Lease provided Officers Grimes and Harris the authority to enter his Unit without a warrant and over his objection. Based on *Washington* and *Clemons*, and in the absence of any meaningful argument to the contrary, the Court therefore finds that Officers Grimes and Harris are not entitled to qualified immunity on St. John's warrantless/unlawful entry claims in Counts III and IV of the Amended Complaint.

### b.     Unreasonable Search and Seizure (Count V)

In Count V, St. John alleges that Defendants Page, Grimes, and Harris violated his Fourth Amendments rights when they searched his Unit on November 27, 2019 without a warrant. (Doc. No. 1 at pp. 18-23.) He further alleges that Defendants violated the Fourth Amendment when they seized both him and his key chain lock during that search. (*Id*.) The Court will first address St. John's unreasonable search claim.

### i.     Search

"To determine whether a Fourth Amendment violation has occurred, we ask two primary questions:  first, whether the alleged government conduct constitutes a search within the meaning of

the Fourth Amendment; and second, whether the search was reasonable." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019).

Regarding the first question, "[u]nder Fourth Amendment jurisprudence, there are two ways in which government action may constitute a search." *United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020). *See also Taylor*, 922 F.3d at 332. "First, 'when the government gains information by physically intruding into a constitutionally protected area -- namely, 'persons, houses, papers, and effects,' U.S. Const. amend. IV -- 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield County, Ohio*, 903 F.3d 553, 561 (6th Cir. 2018) (in turn quoting *Jardines,* 569 U.S. at 5). This first approach is called the "property-based" approach. *Taylor,* 922 F.3d at 332 (citing *United States v. Jones*, 565 U.S. 400 (2012)). Under this approach, "when governmental invasions are accompanied by physical intrusions, a search occurs when the government: (1) trespasses upon a constitutionally protected area, (2) to obtain information." *Id.* (citing *Jones*, 565 U.S. at 404–405).

The second way in which a search occurs is "when 'a government official invades an area in which "a person has a constitutionally protected reasonable expectation of privacy.'" *Id.* (quoting *Taylor*, 922 F.3d at 332) (in turn quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring))). This second approach is referred to as the "*Katz* framework." Under this framework, "there are two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit 'an actual (subjective) expectation of privacy' in the place or thing searched; second, the expectation is one 'that society is prepared to recognize as "reasonable."' *May-Shaw,* 955 F.3d at 567 (quoting *Katz*, 389 U.S. at 361). *See also Trice*, 966 F.3d at 512-513; *Taylor,* 922 F.3d at 332.

As noted above, the determination of whether a search has occurred does not end the analysis because the Fourth Amendment only protects against "*unreasonable* searches and seizures." *Andrews,* 700 F.3d at 854 (emphasis added). *See also Taylor*, 922 F.3d at 333 ("The Fourth Amendment does not proscribe all searches, 'but only those that are unreasonable.'") (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989)).  The Sixth Circuit has instructed that "'we must begin with the basic rule that searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Taylor*, 922 F.3d at 334 (quoting *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)).  *See also Morgan v. Fairfield Cty.*, 903 F.3d 553, 560–61 (6th Cir. 2018).  "A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement." *Andrews*, 700 F.3d at 854.

Here, Defendants argue that they are entitled to qualified immunity because they did not conduct an "illegal search." (Doc. No. 64 at p. 9.)  Defendants maintain that "there was no expectation of privacy here as this was a properly noticed bed bug inspection" that was authorized "by policy" and by the terms of the Lease.  (*Id*.)  Defendants assert that St. John "conceded" that Defendants entered his Unit with his consent and that "neither Grimes nor Harris engaged in any search."  (*Id*.)

St. John does not acknowledge or address Defendants' argument that a search did not occur within the meaning of the Fourth Amendment because he did not have a reasonable expectation of privacy in his Unit considering Article XI of the Lease. (Doc. No. 66.)  As noted above, however, St. John does assert generally that he felt threatened by Officer Grimes and that "Grimes 'ordering' [him] to 'step back' away from the door does not equate to being invited in."  (*Id*. at p. 18.)

The Court will first address St. John's unreasonable search claim against Officers Grimes and Harris. Because it is undisputed that Officers Grimes and Harris physically entered St. John's Unit, the Court applies the "property-based" approach in determining whether Officers Grimes's and Harris's conduct constitutes a "search" within the meaning of the Fourth Amendment. For the following reasons, the Court finds that, under the particular facts presented herein, it does not.

As noted above, under the property-based approach, "a search occurs when the government: (1) trespasses upon a constitutionally protected area, (2) to obtain information." *Taylor,* 922 F.3d at 332 (citing *Jones,* 565 U.S. at 404–405). *See also Widgren v. Maple Grove Twp.*, 429 F.3d 575, 580 (6th Cir. 2005) ("A search generally implies looking 'over or through for the purpose of finding something.'") (quoting *Kyllo v. United States*, 533 U.S. 27, 33, n.1 (2001)). Here, St. John has not argued (or directed this Court's attention to any evidence) that Officers Grimes and Harris entered his Unit on November 27, 2019 "to obtain information." He has not come forward with any evidence that Officer Grimes and/or Officer Harris themselves intended to conduct an inspection of his Unit; or that either Officer did, in fact, conduct an inspection of his Unit. Indeed, during his deposition, St. John was unable to provide any evidence that Grimes or Harris touched any of his belongings, as follows:

> Q:    Okay. Do you have any knowledge, observations with your own eyes or ears, that the police, Mr. --- Officer Grimes or Officer Harris, in any way touched anything in your apartment on 11/27/19?
>
> A:    They could have.
>
> Q:    I didn't ask you if they could have. I said, do you have any knowledge that they did; yes or no?
>
> A:    I don't remember. I don't recall.

(St. John Depo. at Tr. 242.)  Moreover, nowhere in his "Citizen Complaint Form" (which was filed shortly after the November 27, 2019 inspection) does St. John assert that either Officer Grimes or Officer Harris touched any of his belongings or otherwise directly participated in the inspection of his Unit.[24]  (Doc. No. 61-10 at PageID#s 1000-1002.)

Both Officer Grimes and Defendant Page expressly aver that neither Officer Grimes nor Officer Harris participated in the bed bug inspection in any fashion.  Officer Grimes avers that he stood in the corner of St. John's Unit while "Ms. Page and the maintenance employees conducted the bed bug inspection."  (Grimes Decl. at ¶ 10.)  He further avers that "[n]either I nor Officer Harris searched Mr. St. John's unit."  (*Id*.)  Defendant Page likewise avers that "[n]either Officer Grimes nor Officer Harris searched Mr. St. John's unit."[25]  (Page Decl. at ¶ 8.)

In light of the above, the Court finds that St. John has not come forward with sufficient evidence to create a genuine issue of material fact that either Officer Grimes or Officer Harris conducted a "search" of his Unit on November 27, 2019, for purposes of the Fourth Amendment. The Court, therefore, finds that St. John has failed to demonstrate that a constitutional violation occurred.  Officers Grimes and Harris are entitled to qualified immunity with respect to St. John's unreasonable search claim in Count V of the Amended Complaint.

---

[24] It is undisputed that St. John was not arrested or charged with any crimes as a result of the November 27, 2019 incident.

[25] The Court has also reviewed the CMHA PD's Investigation Reports relating to the November 27, 2019 incident.  (Doc. No. 61-10 at PageID#s 1005-1018.)  These Reports include summaries of statements from and/or interviews with Officer Grimes, Officer Harris, Defendant Page, Mr. Williams, and Mr. Allen.  (*Id*.)  Upon careful review, the Court finds nothing in any of these CMHA PD Investigation Reports that indicate that either Officer Grimes or Officer Harris directly participated in a search and/or inspection of St. John's Unit on November 27, 2019.  (*Id*.)

The Court next addresses St. John's unreasonable search claim against Defendant Page.  In contrast to Officers Grimes and Harris, there is evidence in the record that Page participated in the inspection of St. John's Unit on November 27, 2019.  Defendant Page, for example, avers that "[o]nce in the unit, Mr. St. John followed me and the maintenance employees around as the bed bug inspection was being completed," which implies that she was an active participant in the inspection.  (Page Decl. at ¶ 8.)  Additionally, the CMHA PD Investigation Report includes a summary of an interview with Officer Grimes, in which he states that "[a]fter being let into the apartment, Ms. Page and maintenance moved around St. John's apartment pulling pillows off the furniture."  (Doc. No. 61-10 at PageID#1013.)  Notably, Defendants do not expressly dispute that Page (along with Williams and Allen) inspected St. John's Unit for bed bugs on November 27, 2019.  (Doc. No. 64.)

Thus, Defendant Page arguably conducted a search of St. John's Unit for purposes of the Fourth Amendment because she physically entered his Unit without a warrant "to obtain information," i.e., to determine whether there was evidence of bed bugs in his Unit.  However, even assuming *arguendo* that Defendant Page's conduct constituted a "search," the Court finds that no constitutional violation occurred because St. John consented to her entry.  *See Andrews*, 700 F.3d at 854.  As discussed at some length *supra*, Defendant Page provided proper notice under Article XI of the Lease, including notice that "management" would be in his Unit on November 27, 2019 to conduct a bed bug inspection.  St. John does not argue (and there is no evidence) that Defendant Page exceeded the scope of St. John's consent when she conducted the bed bug inspection. Moreover, and as discussed above, St. John does not direct this Court's attention to any legal authority demonstrating that, under the circumstances presented, the Lease provision at issue is insufficient to confer consent.

Based on the above, the Court finds that there is no genuine issue of material fact that St. John consented to Defendant Page's inspection of his Unit on November 27, 2019.  The Court further finds that St. John has, therefore, failed to show that Page violated his Fourth Amendment rights when she conducted the inspection on that date.  Moreover, even assuming *arguendo* that there was a constitutional violation, St. John has not argued or directed this Court's attention to any Supreme Court or Sixth Circuit authority that it was clearly established in November 2019 that Defendant Page's inspection of his Unit for bed bugs violated his Fourth Amendment rights under the circumstances presented herein, (i.e., where St. John signed the Lease; the Lease provided that CMHA management could enter his unit for routine maintenance and inspections with forty-eight hour notice, and notice was properly given to St. John prior to the inspection).  Accordingly, and for all the reasons set forth above, the Court finds that Defendant Page is entitled to qualified immunity with respect to St. John's unreasonable search claim in Count V of the Amended Complaint.

### ii.     Seizure

In Count V, St. John also alleges a § 1983 claim for unreasonable seizure in violation of his Fourth Amendment rights.  (Doc. No. 1 at pp. 18-23.)  Specifically, St. John alleges that, after Defendants entered his Unit: (1) Officer Grimes ordered St. John to "stand in the corner and not to move all while having hand on his gun" and (2) an unidentified male "used a chain saw to cut off Plaintiff's key lock chain." (*Id*. at p. 20.)

Defendants interpret this claim as alleging only the unconstitutional seizure of St. John's key chain lock.  (Doc. No. 64 at p. 12.)  The entirety of Defendants' argument with respect to this claim is as follows:

> With regard to the alleged seizure, it is undisputed that there was no meaningful interference with Plaintiff's possessory interests in the property. Indeed, the lease

terms and bed bug policy acknowledged by Plaintiff vitiate such a claim given that Plaintiff knew his possession of the unit was subject to the lease terms and policies. Here, Plaintiff's seizure claim rests solely on the removal of a chain lock that was an express violation of the lease terms. However, the removal of the chain lock that violated Plaintiff's lease does not constitute a seizure as a matter of law. In other words, the removal was legal. Even if this Court were to find that a seizure did occur, the action taken against Plaintiff's property was entirely reasonable in light of the terms of the lease agreement and the documented issues CMHA was having when it sought to enter Plaintiff's unit for maintenance. (Doc. #61-1, PageID# 562-64); (Doc. #61-2, PageID # 964).

(Doc. No. 64 at p. 12.)

In his Brief in Opposition, St. John asserts that "**Plaintiff was seized** along with his **key lock chain**." (Doc. No. 66 at p. 20) (emphasis in original).  Regarding the seizure of his person, St. John argues that "Grimes ordered [him] to get up and stand in a corner and not to move." (*Id.* at p. 16.) He also asserts that he felt threatened and "traumatized." (*Id.* at pp. 14, 18.)  Regarding the seizure of the key lock chain, St. John argues:

> The lease agreement states not to add additional locks to exterior of door. Exterior means outside as in reference to a dead bolt lock. The Plaintiffs lock was on the interior of the apartment. Plaintiffs apartment had additional key lock chains present when he moved in; which demonstrates they are allowed. Also, tens of residents at Beachcrest have additional dead bolt locks added to their doors; which CMHA is aware of. (See Exhibit 34) The language in the lease makes inference to additional locks being an issue when it comes to "emergencies." Stating the resident will have to pay damages incurred entering apt., if an emergency were to happen. There's no language stating CMHA reserves the right to cut off and/or seize resident's lock. (See Exhibit # 35.)

(*Id.* at pp. 19-20) (grammar and punctuation as in original).

In Reply, Defendants again assert that "the only item that was seized was the chain lock that was cut by the maintenance employee because it is a lease violation." (Doc. No. 70 at pp. 3, 5.) Defendants disagree with St. John's interpretation of the Lease, asserting that "the lease agreement contemplates that a tenant is prohibited from changing the locks or installing new or additional locks on exterior doors – that is, doors leading to the hallway." (*Id.* at p. 2, fn 2.)

60

As an initial matter, the Court disagrees with Defendants that St. John's unreasonable seizure claim is solely predicated on the removal of his key chain lock. The Amended Complaint clearly alleges that, while touching his gun, Officer Grimes ordered St. John to stand in the corner of his Unit as Page, Allen, and Williams conducted the bed bug inspection. (Doc. No. 1 at p. 20.) And, in his Brief in Opposition, St. John expressly argues that he was seized. (Doc. No. 66 at p. 20.) Thus, the Court finds that St. John's § 1983 unreasonable seizure claim includes a claim that Officer Grimes unlawfully seized his person on November 27, 2019.

As noted above, Defendants did not move for summary judgment with respect to this claim. Moreover, even if they had, the Court is not convinced that Officers Grimes and Harris would have been entitled to judgment in their favor.[26] The Sixth Circuit recently explained the meaning of the term "seizure" in the Fourth Amendment context, as follows:

> A seizure can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control. *Torres v. Madrid*, —— U.S. ——, 141 S. Ct. 989, 998, 1001, 209 L.Ed.2d 190 (2021). The first type covers uses of physical force, such as when an officer shoots an individual. *Id*. at 999. Had [Officer] Fox's shots hit the Campbells, then they would have been seized under this category. Since [Officer] Fox missed and there was no physical contact, we look to the second type—acquisition of control. As the Supreme Court has explained, "[u]nlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." *Id*. at 1001. ***

> What constitutes a submission to a show of authority or a termination of freedom of movement? If an officer rams a suspect's car off the road or locks a suspect in a room, the officer has terminated the suspect's freedom of movement and seized the suspect under the Fourth Amendment. *See id*. Alternatively, if an officer orders an individual to stop but the individual continues running away, then there has been no seizure, because there has been no submission to authority or termination of movement. *See California v. Hodari D*., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). As the Supreme Court has recognized, "when an individual's submission to a show of

---

[26] The Court notes that St. John has not directed this Court's attention to any evidence that Defendant Page "seized" his person for purposes of the Fourth Amendment. Accordingly, the Court finds that Defendant Page is entitled to qualified immunity with respect to St. John's unreasonable seizure of his person claim.

governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." *Brendlin v. California*, 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).

> **The Court explained that "a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id*. (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). "Examples of circumstances that might indicate a seizure" include "the threatening presence of several officers [or] the display of a weapon by an officer." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870.**

*Campbell v. Cheatham County Sheriff's Department*, 47 F.4th 468, 476-477 (6th Cir. 2022) (emphasis added).

Here, it is undisputed that Officers Grimes and Harris were acting in their capacity as police officers when they entered St. John's Unit on November 27, 2019.  St. John testified that both Officers were armed with Tasers and handguns.  (St. John Depo. at Tr. 195-196, 204, 263.)  He also testified that Officer Grimes became "irate and belligerent" and screamed, "[t]his is going to be the worst day of your life if you don't move out of the way."  (*Id*. at Tr. 195, 204, 254, 265.)  St. John has introduced evidence that, after Defendants entered his Unit, Officer Grimes first told him to "sit in one spot and not to move" and then "ordered him to stand up and turn around and face the wall." *See* St. John Citizen Complaint Form (Doc. No. 61-10) at PageID# 1002; St. John Depo. at Tr. 239-240.  St. John complied.  (*Id*.)  He testified that he was "held captive against my will" and "was [in] fear of life and limb."  (*Id*. at Tr. 240-241.)

Based on the above, and in the absence of any argument to the contrary, the Court finds there is a genuine issue of material fact regarding whether a reasonable person in St. John's position would have believed that he was not free to leave.  *Campbell,* 47 F.4th at 477.  Accordingly, the Court declines to *sua sponte* grant judgment in Officer Grimes's and Officer Harris's favor on St. John's

claim that he was "seized" for purposes of the Fourth Amendment during the November 27, 2019 bed bug inspection.

The Court next considers whether Defendants are entitled to qualified immunity with respect to St. John's claim that they unlawfully seized his key chain lock. As an initial matter, the Court finds that St. John has not come forward with any evidence that either Officer Grimes or Officer Harris personally "seized" his key lock chain. St. John does not dispute that, once Defendants were inside his Unit, Defendant Page "explained to [him] that the chain lock on his door was unauthorized" and "asked one of the maintenance employees to cut the chain lock off the unit entrance door" (Page Decl. at ¶ 9.) *See also* St. John Citizen Complaint Form (Doc. No. 61-10) at PageID# 1002 (stating that "one maintenance man 'inspected' and the other maintenance man 'cut' off my key link [sic] chain.") St. John has not argued or cited any evidence that either Grimes or Harris personally seized his key lock chain or directed that his key lock chain be seized. Thus, the Court finds that Officers Grimes and Harris are entitled to qualified immunity with respect to this seizure claim. *See, e.g., Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 401 (6th Cir. 2022) ("Because § 1983 does not impose vicarious liability on one officer for the other's actions, we also must look to each Officer's personal actions to assess his individual right to qualified immunity."); *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020) ("'When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.'") (quoting *Smith v. City of Troy,* 874 F.3d 938, 944 (6th Cir. 2017)).

Defendant Page, however, acknowledges that she instructed "one of the maintenance employees to cut the chain lock off" St. John's door. (Page Decl. at ¶ 9.) "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that

property." *United States v. Jacobsen*, 466 U.S. 109, 113, (1984).  *See also Cahoo v. SAS Analytics*, Inc., 912 F.3d 887, 906 (6th Cir. 2019); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016).  "When assessing whether a Fourth Amendment violation has occurred, 'the ultimate touchstone' of the inquiry 'is reasonableness.'" *Partin v. Davis*, 675 Fed. Appx 575, 582 (6th Cir. 2017) (quoting *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010)).

For the following reasons, the Court finds that Defendant Page is entitled to qualified immunity with respect to St. John's claim that she unlawfully seized his key chain lock.  Although St. John undoubtedly had a possessory interest in his key chain lock, it was not unreasonable for Defendant Page to order it removed from his Unit, under the circumstances presented.  As discussed *supra*, Article VIII of the Lease specifically prohibits Residents from "chang[ing] the locks or install[ing] new or additional locks on exterior doors." (Doc. No. 61-2 at PageID# 964.)  This section further provides that "[i]f CMHA cannot easily gain access to the building because of unauthorized locks, Resident will be charged for the additional costs that were incurred to gain such access." (*Id*.) St. John acknowledged in his deposition that he never received permission from CMHA to install his key chain lock.  (St. John Depo. at Tr. 56-57.)  Moreover, the Court rejects St. John's argument that the key chain lock is not prohibited by the Lease because it is placed on the interior of his door, rather than the exterior of his door.  Article VIII of the Lease states that Residents may not "install new or additional locks on exterior doors" – not the exterior *of* their doors.  Thus, the Court finds that, under the plain language of the Lease, St. John's key chain lock constituted a violation of Article VIII of the Lease.[27]

---

[27] The Court also rejects St. John's argument that Defendant Page unlawfully seized his lock because the Lease only contemplates such drastic action in the event of an emergency.  The Lease does not contain any language limiting CMHA's authority to remove an unauthorized lock only in the event of an "emergency."

In light of these specific circumstances, the Court finds that it was not unreasonable for Defendant Page to determine that St. John's key chain lock violated Article VIII of the Lease and to order that it be removed from St. John's door.  Moreover, even assuming *arguendo* that the removal of St. John's key chain lock constituted an unreasonable seizure, St. John has not argued or directed this Court's attention to any Supreme Court or Sixth Circuit authority that it was clearly established in November 2019 that Defendant Page's decision to remove his key chain lock violated the Fourth Amendment under the circumstances presented herein.  Accordingly, and for all the reasons set forth above, the Court finds that Defendant Page is entitled to qualified immunity with respect to St. John's claim that she unlawfully seized his key chain lock in violation of his Fourth Amendment rights.

### c.    Excessive Force (Count VI)

In Count VI, St. John alleges excessive force in violation of the Fourth Amendment.  (Doc. No. 1 at pp. 18-23.)  The Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens.  *Hopper v. Phil Plummer*, 887 F.3d 744, 751 (6th Cir. 2018).  In this context, "[a]n excessive-force claim turns on whether an officer's actions were 'objectively reasonable' given the circumstances he confronted." *Shanaberg v. Licking Cty.*, 936 F.3d 453, 455–56 (6th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  *See also Zuress v. City of Newark, Ohio*, 815 Fed. Appx. 1, 4-5 (6th Cir. 2020).  This is an objective inquiry, in which courts "ask how a reasonable officer would have seen things in the heat of the moment, not in hindsight."[28]

---

[28] To answer this question, courts consider the following factors from *Graham v. Connor, supra* (the "*Graham* factors"): "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Where "a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each stop along the way." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020). *See also Hammond*, 825 Fed. Appx. at 346. The "overarching determination" a court must make, however, "is whether the 'totality of the circumstances' justified the degree of force an officer used." *Shanaberg*, 936 F.3d at 456 (citation omitted).

*Id. See also Shanaberg*, 936 F.3d at 456; *Hammond v. County of Oakland, Michigan*, 825 Fed. Appx. 344, 346 (6th Cir. 2020) ("We analyze that claim based on 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'") (quoting *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011)).

Here, Defendants argue that they are entitled to qualified immunity with respect to this claim because they "did not use any force and their actions were objectively reasonable." (Doc. No. 64 at p. 11.) Defendants assert that neither Officer Grimes nor Officer Harris "unholstered their handguns or Tasers and neither was ever pointed at Plaintiff." (*Id.*) Defendants maintain that "even if Grimes or Harris had threatened Plaintiff, which they did not, such threats do not create a constitutional violation and are insufficient to support a Section 1983 claim." (*Id.*)

In response, St. John argues generally that "the Fourth Amendment prohibits the use of excessive force in police-citizens interactions." (Doc. No. 66 at p. 23.) Although not entirely clear, St. John appears to assert in his Brief in Opposition that he was subjected to excessive force when Officer Grimes became "enraged, belligerent, and violent" and threatened him that "[t]his is going to be the worst day of your life if you don't move out of the way." (*Id.* at p. 18.) He does not, however, address any of Defendants' specific factual or legal arguments regarding why they are entitled to immunity with respect to this claim.

As an initial matter, the Court finds that Defendant Page is entitled to qualified immunity with respect to St. John's excessive force claim. St. John has not introduced any evidence that Page used any force on him or threatened to use any force on him. Nor is there any evidence that Defendant Page had a weapon or brandished a weapon at any time during the November 27, 2019 bed bug inspection, or that she directed or encouraged Officer Grimes or Officer Harris to brandish and/or use

66

their weapons.  Finally, St. John himself acknowledged that Defendant Page never physically touched him.  (St. John Depo. at Tr. 241.)  Accordingly, and considering the above, the Court finds that St. John has failed to demonstrate that there is a genuine issue of material fact that Defendant Page's conduct violated his Fourth Amendment right to be free from excessive force. Defendant Page is, therefore, entitled to qualified immunity with respect to this claim.

Regarding Officers Grimes and Harris, St. John has introduced evidence that Officer Grimes threatened him; both Officers were armed with Tasers and handguns; and that Officer Grimes put his hands on his Taser and handgun.  (St. John Depo. at Tr. 195-196, 197-198, 203-204.)  St. John conceded, however, that he did not see either Officer Grimes or Officer Harris unholster their weapons or point them at him.  (*Id*. at Tr. 215, 263.)  He also conceded that neither Officer Grimes nor Officer Harris ever physically touched him.  (*Id.* at Tr. 241, 247.)  Lastly, St. John acknowledged that he was not physically injured and that he did not seek or receive medical attention for any physical injury as a result of the November 27, 2019 incident.  (*Id*. at Tr. 255-257.)

Thus, the only evidence of "force" is St. John's testimony that Officer Grimes threatened St. John that "[t]his is going to be the worst day of your life" if he did not move out of the way and let the Officers into the Unit.  Courts have found that allegations of verbal harassment against a state agent fail to state a claim under § 1983 because "being placed in fear from spoken words 'is not an actual infringement of a constitutional right'" and "mere 'threat to do an act prohibited by the Constitution' is not 'equivalent to doing the act itself.'" *Newsome v. Erwin*, 137 F.Supp.2d 934, 940 n. 5 (S.D. Ohio 2000) (quoting *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) and *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987)).  *See also Wingo v. Tennessee Dep't of Corr*., 499 Fed. Appx 453, 455 (6th Cir. 2012) (in the Eighth Amendment context, finding that "[v]erbal harassment

67

or idle threats by a state actor do not create a constitutional violation and are insufficient to support a section 1983 claim for relief."); *Cozart v. Spangler,* 2023 WL 2992177 at * 3 (M.D. Tenn. April 18, 2023) (finding that "in this Circuit, a pretrial detainee cannot prevail on an excessive force claim when an officer makes a verbal threat of physical harm without using force, even if the officer brandishes a weapon such as a taser while making the threat"); *El-Bey v. Wallace*, 2023 WL 1857797 at * 11 (S.D. Ohio Feb. 9, 2023) ("[W]hile Plaintiff was seated in the vehicle, Plaintiff only alleges facts that indicate verbal threats from the police officers and nothing more. While Plaintiff argues that the officers used scare tactics through their verbal threats, Plaintiff fails to allege facts that indicate that the officers' words amounted to a constitutional violation."); *Fernbach v. Hamilton County, Ohio*, 2023 WL 1859826 at * 6 (S.D. Ohio Feb. 9, 2023), *adopted by* 2023 WL 2306729 (S.D. Ohio March 1,2023).

In light of the above, and in the absence of any meaningful argument to the contrary, the Court finds that St. John has failed to demonstrate that there is a genuine issue of material fact that either Officer Grimes's or Officer Harris's conduct violated his Fourth Amendment right to be free from excessive force.  At most, St. John has introduced evidence that Officer Grimes threatened him and put his hand on his Taser and/or handgun.  He has not directed this Court's attention to any evidence that either Officer brandished their weapons, used their weapons, or physically touched him in any way.  Accordingly, the Court finds that St. John has failed to come forward with sufficient evidence to create a genuine issue of material fact that either Officers Grimes's or Officer Harris's conduct violated his Fourth Amendment right to be free from excessive force.  Officers Grimes and Harris are, therefore, entitled to qualified immunity with respect to this claim.

**D.      Claims under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631**

In his Amended Complaint, St. John alleges, summarily, that Defendants violated his rights under 18 U.S.C. § 242 and 18 U.S.C. § 249.  (Doc. No. 1 at p. 23.) In addition, in the caption of his Amended Complaint (but not the body), St. John lists 42 U.S.C. § 3631 as one of the statutes under which he is bringing a claim.[29]  (*Id.* at p. 1, caption).

Defendants move for summary judgment in their favor with respect to 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631.  (Doc. No. 64 at pp. 12-13.)  St. John does not acknowledge or address Defendants' arguments with respect to any of these claims in his Brief in Opposition. (Doc. No. 66.)

The Court finds that Defendants are entitled to summary judgment in their favor with respect to St. John's claims under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631.  First, St. John abandoned these claims by failing to address them in his Brief in Opposition. *See Brown*, 545 Fed. Appx at 372 (noting that "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") *See also Wierengo v. Akal Sec., Inc.*, 580 Fed. Appx 364, 369 n.1 (6th Cir. 2014); *Hicks v. Concorde Career Coll.,* 449 Fed. Appx 484, 487 (6th Cir. 2011).

Second, it is well established in this Circuit that there is no private right of action under either 18 U.S.C § 242, 18 U.S.C. § 249, or 42 U.S.C. § 3631.  *See U.S. v. Oguaju*, 76 Fed. Appx. 579, 581 (6th Cir. 2003) ("[T]he district court properly dismissed Oguaju's claim pursuant to 18 U.S.C. §§ 241 or 242 because Oguaju has no private right of action under either of these criminal statutes."); *Harris*

---

[29] On page 23 of his Amended Complaint, St. John also asserts claims under 42 U.S.C. § 3613 and 42 U.S.C. § 3604. (Doc. No. 1 at p. 23.)  These statutes are part of the Fair Housing Act.  This Court previously dismissed St. John's Fair Housing Act claims on August 30, 2022.  (Doc. No. 18.)

*v. Hunt*, 2023 WL 8432699 at * 2 (6th Cir. 2023) ("To the extent that Harris attempted to sue the defendants under 18 U.S.C. § 242, which makes it a crime to willfully violate someone's constitutional rights, the district court correctly concluded that a private cause of action was not available to him."); *Jones v. Grafton Correctional Institution Staff*, 2018 WL 1871090 at * 2 (N.D. Ohio April 19, 2018) ("Plaintiff first asserts claims under 18 U.S.C. §§ 242, 245, and 249. These are criminal statutes. They provide no private right of action."); *Everage v. Central Broadcasting Systems Corp., Inc.,* 2019 WL 1063367 at * 2 (E.D. Ky. March 6, 2019) ("[T]he Hate Crimes Prevention Act, 18 U.S.C. § 249, provides criminal penalties for crimes involving race, religion, national origin, gender, sexual orientation, gender identity, or disability. But the statute does not authorize a private right of action."); *Johnson v. Kentucky*, 2021 WL 2908113 at * 3 (W.D. Ky. July 9, 2021) ("Courts, including this one, have also held that 18 U.S.C. § 249 … contains no private cause of action.") (collecting cases); *Cordell v. Town of Signal Mountain*, 2014 WL 5704662 at * 4 (E.D. Tenn. Nov. 5, 2014) ("Similarly, 42 U.S.C. § 3631, part of the Fair Housing Act, is also a criminal statute under which there is no private cause of action.") (collecting cases); *Jones v. Barr*, 2021 WL 2311418 at * 3 (W.D. Tenn. June 7, 2021) (finding that 42 U.S.C. § 3631 does not provide a private cause of action).

Accordingly, Defendants are entitled to summary judgment in their favor with respect to St. John's claims under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631.

**V.     Conclusion**

For the foregoing reasons, St. John's Motion to Strike (Doc. No. 74) is DENIED.  Defendants' Motion for Summary Judgment (Doc. No. 64) is GRANTED IN PART and DENIED IN PART, as follows:

- With regard to Counts III and IV for unlawful/warrantless entry, Defendants' Motion is granted with respect to Defendant Page but denied as to Defendants Grimes and Harris.

- With regard to Count V for unreasonable search and seizure, Defendants' Motion is granted with respect to Plaintiff's unreasonable search claims against Defendants Page, Grimes, and Harris.  Defendants' Motion is also granted with respect to Plaintiff's claims that (1) Defendant Page unreasonably seized his person; and (2) Defendants Page, Grimes and Harris unreasonably seized his key chain lock. Defendants' Motion is denied with respect to Plaintiff's claim that Defendants Grimes and Harris unreasonably seized his person.

- With regard to Count VI for excessive force, Defendants' Motion is granted as to Defendants Page, Grimes, and Harris.

- Defendants' Motion is granted as to Plaintiff's claims under 18 U.S.C. § 242, 18 U.S.C. § 249, and 42 U.S.C. § 3631.

Thus, the only remaining claims in this action are St. John's (1) unlawful/warrantless entry claims against Defendants Grimes and Harris; and (2) unreasonable seizure of his person claim against Defendants Grimes and Harris.

**IT IS SO ORDERED.**

      *s/Pamela A. Barker*

      PAMELA A. BARKER

Date:  January 26, 2024      U. S. DISTRICT JUDGE